# EXHIBIT B
# Part 1 of 3

MC-275

Name    Glynnon Evins

Address    P.O. Box 689, FW-316L

Soledad, CA 93960-0689

CDC or ID Number    D-24948

FILED

OCT 05 2006

FRESNO SUPERIOR COURT

_____ DEPUTY

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF FRESNO

(Court)

GLYNNON EVINS,
Petitioner

vs.

BEN CURRY, Warden, (A),
GOVERNOR SCHWARZENEGGER, Real Party
Respondent                    In Interest.

**PETITION FOR WRIT OF HABEAS CORPUS**

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

| | |
|---|---|
| ☐ A conviction | ☒ Parole |
| ☐ A sentence | ☐ Credits |
| ☐ Jail or prison conditions | ☐ Prison discipline |
| ☐ Other *(specify)*: _____ | |

1. Your name:  **Glynnon Evins**

2. Where are you incarcerated?  **The Correctional Training Facility, Soledad, California**

3. Why are you in custody?  ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      **Second degree murder with use of firearm**

   b. Penal or other code sections:  **Penal Code sections 187 and 12022.5**

   c. Name and location of sentencing or committing court:  **Superior Court of California, 1100 Van Ness, Fresno, CA 93724-0002**

   d. Case number:  **335276**

   e. Date convicted or committed:  **March 10, 1986**

   f. Date sentenced:  **unknown**

   g. Length of sentence:  **15 years to life plus 2 years**

   h. When do you expect to be released?  **Unknown**

   i. Were you represented by counsel in the trial court?  ☒ Yes.   ☐ No.  If yes, state the attorney's name and address:

      **unknown**

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6. GROUNDS FOR RELIEF
   **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE GOVERNOR'S REVERSAL OF PETITIONER'S PAROLE GRANT, BASED

ON THE EVIDENCE PRESENTED, UNREASONABLY AND UNLAWFULLY DEPRIVED

HIM OF PAROLE, A LIBERTY INTEREST, AND DUE PROCESS.

a. Supporting facts:
   Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

1. Petitioner was convicted of second degree murder in 1986. Petitioner was sentenced to a period of 15 years to life plus 2 years. Petitioner's Minimum Eligible Parole Release Date (MEPD) was established as January 21, 1996.

2. Although Penal Code § 3041, subd. (a) states that a parole release date shall normally be set one year prior to that MEPD, the Board invoked its authority under Penal Code § 3041, subd. (b), to not set Petitioner's parole release, stating that it had made a determination that Petitioner posed an unreasonable threat to public safety if he was released on parole.

3. After repeated denials of parole based on the claim that Petitioner posed a threat to public safety, on September 15, 2003, the Board found Petitioner suitable for parole and set a parole date. The date calculated by the panel turned out to be two years past the uniform and proportional term established

---- CONTINUE ON PAGE 7 ----

b. Supporting cases, rules, or other authority (optional):
   *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page).*

SEE ATTACHED MEMORANDUM OF POINTS AND AUTHORITIES, PAGE 13.

7. **Ground 2** or Ground _____ (if applicable):

AMENDMENT OF THE CALIFORNIA CONSTITUTION, VESTING NEW POWERS UPON

THE GOVERNOR IS EX POST FACTO AS TO PETITIONER, AND IN ADDITION,

DEPRIVED PRISONERS OF A NEUTRAL AND DETACHED DECISIONMAKER.

a. Supporting facts:

The addition of Article V, section 8(b), of the California Constitution, vesting California Governors with the power to affirm, modify, or reverse the parole authority's parole decisions, "created a significant risk of increased punishment" and is thus an ex post facto law. The critical question in ex post facto challenges to retroactively applied parole regulations is whether, as a practical matter, the retroactive application creates a significant risk of prolonging an inmate's incarceration. That is;

"When the rule does not by its own terms show a significant risk, the [inmate] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive implementation will result in a longer period of incarceration than under the previous rule." (Garner v. Jones, 529 U.S. 244, 255 (2000).)

While it may be that the regulations or guidelines were not altered, the newly authorized decisionmaker and politician highly concerned with political appearances, cannot be considered to be "neutral" or "detached." Due process requires a 'neutral and detached judge in the first instance." (Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); Ward v. Monroeville, 409 U.S. 57, 61-62, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).) At least two district courts have considered evidence

b. Supporting cases, rules, or other authority: CONTINUE ON FOLLOWING PAGE 4B ——

with respect to whether Governors Wilson, Davis and now Schwarzenegger have discharged their duties with respect to parole matters in a "neutral" or "detached" manner and determined that they have not.  Martin v. Marshall, 431 F.Supp.2d 1038 (N.D.Cal. 2006), citing Coleman v. Board of Prison Terms, No. 96-0783 LKK PAN (E.D.Cal. 2005)  Petitioner asserts those findings as an alternative or additional ground and basis for relief.

Although the "some evidence" standard has been applied, Petitioner contends that, first, it is not established by Supreme Court authority in the context of parole suitability proceedings, which do not involve exigent circumstances justifying such a minimal standard, and asserts that "preponderance of the evidence" is required by state law under the Evidence Code, § 215, and by the regulations governing the Board's decisions.  Reviewing courts should not hold the Board to a reduced standard because it deprives prisoners of that required quantum of evidence, established by the Penal Code § 3041(a) "shall normally" language.  Moreover, no 9th Circuit case has considered its application in a reasoned decision, or to contemplate fundamental Supreme Court due process principles:

> "[t]he requirements of due process vary with the private and governmental interests at stake and the circumstances of the alleged deprivation ... To insure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring due process of law."  Biggs v. Terhune, 334 F.3d 910, 916, citing Morrisey v. Brewer, 408 U.S. 471, 481, and Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1 (1979).

These principles, however, have been applied in the case of Robert Rosenkrantz, as noted in Ground One, Memorandum of Points and Authorities.

/////

/////

8. Did you appeal from the conviction, sentence, or commitment?    [X] Yes.    [ ] No.    If yes, give the following information:

   a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

     **Court of Appeal**

   b.  Result  **Conviction affirmed**    c.  Date of decision: **unknown**

   d.  Case number or citation of opinion, if known:  **unknown**

   e.  Issues raised:  (1)  **unknown**

       (2) _____

       (3) _____

   f.  Were you represented by counsel on appeal?  [X] Yes.  [ ] No. If yes, state the attorney's name and address, if known:

     **unknown**

9. Did you seek review in the California Supreme Court?  [ ] Yes  [ ] No.  If yes, give the following information:

   a.  Result _____    b.  Date of decision: _____

   c.  Case number or citation of opinion, if known: _____

   d.  Issues raised:  (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

     **N/A**

11. Administrative Review:

   a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

     **No administrative remedies are available.**

   b.  Did you seek the highest level of administrative review available?  [ ] Yes.  [X] No.  **See 11.a.**

   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

     (2) Nature of proceeding (for example, "habeas corpus petition"): _____

     (3) Issues raised: (a) _____

          (b) _____

     (4) Result (Attach order or explain why unavailable): _____

     (5) Date of decision: _____

  b.  (1) Name of court: _____

     (2) Nature of proceeding: _____

     (3) Issues raised: (a) _____

          (b) _____

     (4) Result (Attach order or explain why unavailable): _____

     (5) Date of decision: _____

  c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

    The only delay has been in waiting for other inmates to help fashion this appeal because petitioner has no knowledge in law.

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☒ Yes. ☐ No. If yes, explain:

A petition in the United States district court has been filed re prior reversal

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

  This is the court of jurisdiction.  In re Roberts (2005) 36 Cal.4th 575, 587; Cal.Rules of Court, Rule 60(e)(2)

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 8/20/06

▶ _~Shannon Evans~_
(SIGNATURE OF PETITIONER)

by the matrix for his offense circumstances and prior convicted offenses. (Ex. C, "DECISION, 9-15-03")  (Ex. D, Term Calculation, 9-15-03.)

4. On February 11, 2004, however, Governor Schwarzenegger exercised his authority under Penal Code § 3041.2 and reversed the Board's decision. (Ex. E)

5. On January 4, 2006, a different panel again found Petitioner suitable for parole and granted parole. (Ex. B, Hearing Transcript, 1-04-06.)

6. On June 2, 2006, Governor Schwarzenegger again exercised his authority under Penal Code § 3041.2 and again reversed the Board's decision finding that Petitioner no longer presented a threat to public safety.  The Governor relied on the following reasons to reverse the Board's decision:

A. "The second degree murder for which he was convicted was an especially heinous one because it was carried out in a manner demonstrating callous disregard for human suffering and life."

B. "Further, there is evidence in the record before me that this murder involved some level of premeditation."

C. "Although Mr. Evins says he accepts responsibility and is remorseful for Mr. Rogers' murder, he has maintained for many years that the gun went off accidently.  His current version at least acknowledges that he pulled the trigger, whereas his initial story to investigators was that he did not shoot Mr. Rogers at all.  As I said in 2004, Mr. Evins story has changed quite a bit over the years."  In support of that claim, the Governor then refers to parts of psychological evaluations in 1989, 1994, 1996, a 2000 "prisoner evaluation," and a 2003 psychological evaluation.

D. The fourth and final reason stated by the Governor was that the District Attorney of Fresno County opposed Petitioner's parole, "citing concerns

that Mr. Evins' claim that both Mr. Rogers' murder and the previous
voluntary manslaughter for which he was convicted were accidental."
(Ex. A)

7.    Petitioner alleges that the Governor's decision was not supported by the
evidence or mischaracterizes statements or facts.  Specifically, each
of the reasons referenced in the foregoing paragraph 6 fail for the
following reasons:

(6A)    "The second degree murder ... was an especially heinous one because
it was carried out in a manner demonstrating callous disregard for
human suffering ...."

Case law requires that for this factor to be apply the victim must have
suffered gratuitous cruelty such as prolonged infliction of pain or torture
prior to the act resulting in death.  (In re Scott (2005) 34 Cal.Rptr.3d
905, 921-922, citing In re Scott (2004) 119 Cal.App.4th 871, 889-892.
(Review Denied July 22, 2004).)   There is no evidence of such facts in
this case.  Petitioner did not inflict gratuitous cruelty, pain or torture
upon the victim prior to the act resulting in death.

(6B)    "Further, there is some evidence in the record before me that
this murder involved some level of premeditation."

First, Petitioner's jury convicted him of second degree murder, not
premeditated first degree murder.  This strongly suggests that the jury,
having had the opportunity to look at and hear the witnesses and assess
their credibility, rejected the government's allegations of first degree
murder and premeditation.  Like the Board, the Governor must accept the
findings of the court and may not retry the case. (Ex. B, p. 4:17-19.)
Second, the statements made by Petitioner were taken out of context by
the Governor.  Petitioner has repeatedly explained that he was armed

because of problems he had with another person, who had robbed him and
threatened to kill him. Petitioner has also related that someone had
shot up his brother's car the previous evening and was carrying a weapon
for that reason as well. It was simply an incident that had not been
put in the record. Petitioner then repeated the same story he'd previously
related. (Ex. F, 6-21-03 Psychological Report, p. 2.) The Governor claims
that Petitioner's story "has changed quite a bit over the years," but
an unbiased examination will show that it has not changed at all, with
the sole exception occurring before Petitioner was delivered into the
custody of the Department of Corrections over 20 years ago, before his
recovery and rehabilitation began. The Governor's characterization of
the offense circumstances involving premeditation is inconsistent with
the jury's finding of second degree murder.

(6C) "Although Mr. Evins says that he accepts responsibility and is
remorseful for Mr. Rogers' murder, he has maintained for many years
that the gun went off accidently. His current version at least
acknowledges that he pulled the trigger, whereas his initial story
to investigators was that he did not shoot Mr. Rogers at all. As
I said in 2004, Mr. Evins story has changed quite a bit over the
years."

The "initial story to investigators" was taken from the Probation Officer's
Report. (Ex. G) This fact does not constitute evidence of current threat
to public safety, or even evidence that Petitioner lacked remorse at the
time but simply that Petitioner was a drug addict, exhibiting the symptoms,
and did not want to go to prison. Furthermore, even if Petitioner did
not initially admit to arresting officers to shooting Mr. Rogers, the
Governor is punishing Petitioner for having exercised a constitutional

right not to incriminate himself and not admit guilt. Such a fact does not support a claim that Petitioner therefore had then or has now no remorse for shooting and killing Mr. Rogers. Petitioner's statement that it was accidental has also been explained repeatedly. Petitioner did not even know Mr. Rogers, and admitted to shooting him long ago, yet the Governor claims that Petitioner's "current version at least acknowledges that he pulled the trigger ..."

The Governor splits hairs. In 1996, for example, Petitioner explained to the psychologist that when a man beside her jumped up that he "shot automatically." (Ex. F) Petitioner has repeatedly explained that the shooting of Mr. Rogers was not intentional, not that he did not pull the trigger. That Petitioner has stated that it was accidental does not imply that he did not pull the trigger, but only that it happened accidently when he was startled by there being someone in the room with Ms. Johnson and sitting up suddenly. The same Ms. Johnson testified that Petitioner asked Mr. Rogers if he had been hit, obviously concerned that he had hit him. There would be no reason to ask an intended victim if he'd been hit. Further, Petitioner fired <u>one time</u>, not multiple times as intentional murder likely would have involved.

The Governor also claimed that Petitioner "snuck" into Ms. Johnson's house, "awoke" Mr. Rogers, "ordered him to get up," and then shot him in the chest and left him there to bleed to death." This version is clearly inconsistent with the second degree offense Petitioner was convicted of. Petitioner did not sneak into the house as Petitioner explained in the same 2003 Psychological Report. Petitioner explained that because it was a drug house and people frequently came and went out of that residence, he felt free to walk into the residence, through the open front door.

(Ex. B, p. 13.)  With respect to the "get up" statement Petitioner allegedly made, if made it was made to Ms. Johnson.  It was her bedroom, it was dark and Petitioner had no knowledge that anyone was with her. Although Petitioner knew the person that had previously robbed him at gunpoint may have been there, he had not seen him and did not know anyone was in the room with Ms. Johnson.  While Petitioner was ready for anything, he was "high" and even now is not sure about what he did say, except that whatever he said it was directed at Ms. Johnson. (Ex. B, p. 21.)

Every part of every psychological evaluation is consistent with each other. The inconsistencies are created by the manner in which the Governor picks pieces of each report to make it appear that Petitioner's story is changing.  An unbiased close examination of the reports demonstrates that, in context, every statement by Petitioner is consistent with other statements.  (See Ex. F, 1989; 1994, 1996, 1999, 2002, 2003, 2004 and 2005 Psychological Reports, and the January 2000 Life Prisoner Evaluation Report.)  Nevertheless, it is clear is that the Legislature did not deem admission to the offense or any particular version as a requirement for being found suitable.  (Penal Code § 5011(b).)

(6D)  The last reason stated by the Governor, 6. D, is that the Fresno County District Attorney cited concerns which allege that Petitioner claims that the second degree murder and prior voluntary manslaughter were accidental.  Petitioner has never claimed that the voluntary manslaughter was accidental, but that it occurred in defense of a girlfriend that was being assaulted by a person who had attempted to use a gun when Petitioner went to her defense.  After fighting for the gun Petitioner gained control of it and shot the attacker.  Petitioner had just returned from Vietnam at the time, 1974, more than 10 years before the current offense.  The

circumstances were discussed at the hearing. (Ex. B, pp. 45-46.) The Governor's insistence on misconstruing the meaning of Petitioner's statements about the second degree murder being an accident reflects a predetermined intent to find a lack of remorse and failure to take responsibility to justify reversing the Board's parole grant for the second time. The Deputy District Attorney's assertion, like the Governor's, is also blind to Petitioner's explanation of why he said the shooting was accidental. (Ex. B, p. 37.)

8. Petitioner contends that the Governor's reversal of the parole grant, especially for a second time, without relevant or reliable evidence demonstrating that Petitioner currently poses a threat — much less an unreasonable threat — to public safety, unlawfully deprived him of a liberty interest protected by the Due Process Clause of the United States Constitution, and similar provisions of the California Constitution.

9. This petition is also based on the attached Memorandum of Points and Authorities, hereby incorporated by reference.

PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that the Court:

1. Issue an order to show cause;

2. Appoint counsel to represent Petitioner, who is indigent and without knowledge in law;

3. Order an evidentiary hearing to settle disputed matters;

4. Order reasonable discovery, such other documents as may be necessary to settle disputed issues;

5. Grant this petition and order Petitioner's parole grant and release date reinstated pursuant to In re Mark Smith (2003) 109 Cal.App.4th 489, because a remand to the Governor would be futile as there is no current or relevant evidence demonstrating that Petitioner poses a continuing threat to public safety;

6. Issue any other order as the Court deems necessary to effect the ends of justice.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STANDARD OF REVIEW

Article V, section 8(b), of the California Constitution provides that the Governor may review the parole decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. (In re Rosenkrantz (2002) 29 Cal.4th 616, 677.) Additionally, the evidence underlying the parole authority's [or Governor's] decision must have some indicia of reliability. (Biggs v. Terhune, 334 F.3d 910, 915, quoting Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).)

### THE SPECIFIED FACTORS

The specified factors applicable to the Board's, and therefore also to the Governor's, parole decisions are set forth in Penal Code section 3041 and Board regulations (promulgated pursuant to subdivision (a) of section 3041) establishing criteria for determining suitability for release on parole. (Cal.Code Regs., tit. 15, § 2402.) The factor statutorily required to be considered, and the overaching consideration, is "public safety."

As stated in subdivision (b) of Penal Code section 3041, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety

requires a more lengthy period of incarceration for this individual...."

The factors required to be considered by Board regulations are for the most part specified in section 2402 of title 15 of the California Code of Regulations, which consists of four subdivisions. Subdivision (a), which reiterates the statutory factor, states that "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."

Subdivision (b) provide that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released into the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."

Subdivision (c) specifies six nonexclusive factors tending to show unsuitability, the relative importance of which "is left to the judgment of the panel." The specified factors are:

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A)  Multiple victims were attacked, injured or killed in the same or separate incidents.

(B)  The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C)  ᵛⁱᶜᵗim was abused, defiled or mutilated during or after the
ffe se

se was carried out in a manner which demonstrates an
ᵉᵖᵗⁱᶜ      s disregard for human suffering.

e for the crime is inexplicable or very trivial in relation

ᵉ

(ˊ)      ᵘᵣ  ᵣd of Violence.  The prisoner on previous occasions inflicted
attempted to i lict serious injury on a victim, particularly if the
prisoner demonstrate serious assaultive behavior at an early age.

(  nstable Social History.  The prisoner has a history of unstable or
tumultuous relationships with others.

( Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted
another in a manner calculated to inflict pain or fear upon the victim.

(5)      Psychological factors.  The prisoner has a lengthy history of severe
mental      related to the offense.

(6)  Institutional behavior.  The prisoner has engaged in serious misconduct
in pri

C.      factors, the Governor relied on, first, § 2402(1)(D)
of the      itability factors, stating that "... the second degree
murder      as convicted was an especially heinous one because it
was car      manner demonstrating callous disregard for human suffering
and lif      in reversing the Board's parole grant, the Governor
stated t      uck into Ms. Johnson's home, awoke Mr. Rogers, ordered

him to get up, and then shot him in the chest and left him there to bleed
to death." Petitioner has denied and denies this first degree murder version
of the offense, but even discounting the fact that the jury rejected first
degree murder, the circumstances alleged by the Governor still do not meet
the requirements of § 2402(1),(D) as established by case law. For an offense
to qualify as having been "carried out in a manner which demonstrates a callous
disregard for human suffering," the offense "must have been committed in a
more aggravated or violent manner than that ordinarily shown in the commission
of second degree murder." (In re Scott (2004) 119 Cal.App.4th 891, 891.)
The court further explained:

> "In re Van Houten (2004) 116 Cal.App.4th 339, 10 Cal.Rptr.3d
> 406 illustrates the sort of gratuitous cruelty required. The
> prisoner in that case was involved in multiple stabbings of
> a woman with a knife and bayonet. While she was dying, the
> victim was made aware her husband was suffering a similarly
> gruesome fate. As stated by the court, "[t]hese acts of cruelty
> far exceeded the minimum necessary to stab a victim to death."
> (Id. at p.351, 10 Cal.Rptr.3d 406.) Other examples of aggravated
> conduct reflecting an "exceptionally callous disregard for human
> suffering," are set forth in Board regulations relating to the
> matrix used to set base terms for life prisoners (§ 2282, subd.
> (b)); namely, "torture." as where the "[v]ictim was subjected
> to the prolonged infliction of physical pain through the use
> of non-deadly force prior to act resulting in death," and "severe
> trauma," inflicted with deadly intensity; e.g., beating,
> clubbing, stabbing, strangulation, suffocation, burning, multiple
> wounds inflicted with a weapon not resulting in immediate death
> or actions calculated to induce terror in the victim. (Ibid.)
> No such facts or anything remotely similar are present in this
> case. As in In re Smith, supra, 114 Cal.App.4th 343, 7
> Cal.Rptr.3d 655, there is no evidence Scott "tormented,
> terrorized, or injured [his victim] before deciding to shoot
> [him], or that he gratuitously increased or unnecessarily
> prolonged [his] pain and suffering.... Was the crime callous?
> Yes. However, are the facts of the crime some evidence that
> he acted with exceptionally callous disregard for [the victim's
> suffering; or do the facts distinguish this crime from other
> second degree murders as exceptionally callous? No." (Id. at
> p. 367, 7 Cal.Rptr.3d 655.) (Scott, supra, 119 Cal.App.4th
> at 891-892.)

Like in Scott, "Because the relevant evidence shows no more callous
disregard for human suffering than is shown by most second degree murder

offenses, the Board's use of this factor to conclude that [Petitioner] committed his offense "in an especially cruel and callous manner" was arbitrary and capricious." (Ibid.)

The Governor also alleged: "Further, there is evidence in the record before me that this murder involved some level of premeditation." The Governor points to Petitioner's response to the Deputy District Attorney's question:

> DEPUTY DISTRICT ATTORNEY HAAS: Evins. "Did he plan on shooting the other person when he went to the house where Marcy was at in the bedroom with the gun?"
>
> INMATE EVINS: "Possibly because we had had — this other person had pulled a gun on me at that same house, probably within the last 48 hours of that and robbed me." (Ex. B, p. 87.)

Despite the Deputy District Attorney's backdoor method of producing first degree murder "evidence in the record," Petitioner's statement does not support the Governor's conclusion that premeditation was involved, as in first degree murder. Petitioner said "_Possibly_ because we had had — this other person had pulled a gun on me at that same house, probably within the last 48 hours of that and robbed me." (emphasis added) The statement indicates Petitioner _did not_ mean murder, but only that he had known there was the possibility that he would have to shoot that other person because that person had previously pulled a gun on him and known to be dangerous.

The Deputy District Attorney's question was framed in such a manner that it could have been asking whether Petitioner intended to shoot the other person that was supposed to have been in the house, or shooting the other person in the bedroom, implying that he knew someone other than Marcy was in the bedroom. Either way it asked if Petitioner _planned_ to shoot the other person. The Governor, like the Board, is required to accept the findings by the jury, which found no premeditation. Petitioner's response, nevertheless, was

"possibly," meaning that there was a possibility he might have to shoot the person when he embarked on the trip to that house, not "Yes, I meant to kill him in the bedroom." Another statement relied upon by the Governor to allege premeditation was Petitioner's statement that "it was the wrong person, and I did go there to get [a different] guy ..." (Ex. B, p. 102.) That statement, however, did not mean Petitioner intended to kill even Mr. Newhouse, who had threatened to kill Petitioner, but "to get my money back or something." (Ex. B, p. 88.) "Or something" meant to perhaps take his car, an expensive watch, his drugs, "or something."

The Governor also relied on the Probation Officer's Report where it states that Petitioner had made statements that he would kill anyone that messed with Marcy Johnson. The POR states at page 2: "Evidence and testimony presented to the jury was not made available to this officer in relation to the circumstances of the offense. Therefore, information contained in this section was obtained from the testimony at the preliminary hearing ...." (Ex. G, p. 2.) On page 3 of that POR it states that "Fresno Police officers learned that Marcy Johnson was Glynnon Evins' ex-girlfriend and that he had made previous statements that he would kill anyone who messed around with Marcy Johnson."

Both Marcy Johnson and Patricia Wise had motive to offer police another reason why Petitioner shot Mr. Rogers. Like Petitioner, both were involved in illegal drug activies. However, Patricia Wise also had children there and would hardly want to say "oh, Marcy owed him money for drugs. Yeah, we are using drugs here, in this house with my kids living here." Petitioner has repeatedly explained that Marcy Johnson was not his girlfriend, and that his relationship with her was based on drugs and sex but nothing serious. (e.g., Ex. F, 1989 Psychological Report, Ex. B, p. 34.) Ms. Johnson owed

Petitioner money for drugs he sold her and Petitioner wanted his money. Another reason Petitioner went to the house was to loan some of the money to his friend for a motorcycle he wanted. There was also a possibility that the person that had robbed him was at the house, but, as previously discussed, there was no intent to kill anyone. The jury agreed and convicted Petitioner of second degree murder. (Ex. F, 1989 Psychological Report, p. 2; 1994 Psychological Report; Ex. B, p. 20.) Of course, if a decisionmaker wants to justify reversal of the Board's decision, possibilities and relevant facts might be overlooked, if no current or reliable evidence demonstrates that a prisoner currently poses a threat to public safety, as occurred here.

## CONCLUSION

Petitioner had been using/selling drugs and admittedly was "high" at the time of the commitment offense, which to some degree explains the uncertainty of his memory of the event. (Ex. B, pp. 20-25.) Like many Vietnam veterans, Petitioner suffered from posttraumatic stress syndrome and became immersed in the drug culture. Although a relevant factor in this case, the Governor clearly discounts the seriousness of the disorder suffered by some servicemen that see combat. Nevertheless, relevant to an honest and unbiased determination is Petitioner's exemplary postconviction record. The one fact that could be considered to indicate continued threat to public safety is the voluntary manslaughter conviction in 1974, shortly after returning from his tour of duty. (Ex. B, pp. 41-51.) The circumstances of that offense involved self-defense but Petitioner plead guilty to manslaughter. Ten years passed before the current offense was committed. Since incarceration there has been no further incidents of violence or criminal activities. To the contrary, as the Governor admits, Petitioner has achieved the goal espoused by the prison system – rehabilitation. Like Rosenkrantz, Petitioner's offense

occurred in 1986.  Robert Rosenkrantz has been ordered released by the Los Angeles County Superior Court, Case No. BH003529.  Judge David S. Wesley stated:  "Petitioner has now served in excess of the maximum term for both second degree and first degree murder.  Therefore, the commitment offense should no longer function as a factor of unsuitability and in that case, it should no longer operate as "some evidence" to support the Board's parole denial.  Petitioner has reached the point in which the denial of parole can no longer be justified by reliance on his commitment offense.  The Board's continued reliance on the circumstances of the offense runs contrary to the rehabilitative goals espoused by the prison system and has violated petitioner's due process."

That was Rosenkrantz's April 25, 2005, hearing.  On July 31, 2006, the Court of Appeal summarily denied the AG's petition for writ of supersedeas/stay. was summarily denied.  On August 3, 2006, the Supreme Court denied review/application for stay.  On August 1, 2006, the United States District Court for the Central District of California, Case No. CV 05-3836, 2006 WL 2327085, ___ F.Supp.2d ___, issued its own order for Rosenkrantz's release, finding that continued reliance upon the nature of the crime violated due process.  That was Rosenkrantz's January 5, 2004, hearing.

There is no evidence that Petitioner continues to pose a threat to public safety.  Our California Supreme Court, by declining to review the Superior Court's decision, appears to concur with Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003).  Here the Governor also relied soley on the commitment offense and conduct prior to incarceration, and violated due process.

/////

/////

## TABLE OF EXHIBITS

EXHIBIT A — JUNE 2, 2006 GOVERNOR'S REVERSAL OF PAROLE GRANT

EXHIBIT B — JANUARY 4, 2006, BPH HEARING TRANSCRIPT

EXHIBIT C — SEPTEMBER 15, 2003, BPT HEARING DECISION

EXHIBIT D — SEPTEMBER 15, 2003, TENTATIVE TERM CALCULATION

EXHIBIT E — FEBRUARY 11, 2004, GOVERNOR'S REVERSAL OF PAROLE GRANT

EXHIBIT F — PSYCHOLOGICAL REPORTS: 1989, 1994, 1996, 1999, 2002, 2003, 2004, 2005; AND 2000 PRISONER EVALUATION

EXHIBIT G — PROBATION OFFICER'S REPORT

# EXHIBIT "A"



# OFFICE OF THE GOVERNOR

June 2, 2006

*Via Facsimile and U.S. Mail*

Mr. Glynnon Evins, D-24948
*Correctional Training Facility*
FW – 316L
Post Office Box 686
Soledad, California 93960

Dear Mr. Evins:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

ANDREA LYNN HOCH
Legal Affairs Secretary

Attachment

cc: Board of Parole Hearings (w/attachment)

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**GLYNNON EVINS, D-24948**
**SECOND-DEGREE MURDER**

AFFIRM: _____

MODIFY: _____

REVERSE: _____X_____

On January 14, 1985, 36-year-old Glynnon Evins shot and killed Otis Ray Rogers. According to the probation report, the morning of Mr. Rogers' murder, Mr. Evins and his friend, Kenneth Parker, went to the home of Mr. Evins' former girlfriend, Marcy Johnson, in Fresno, California. When they arrived, Ms. Johnson and Mr. Rogers were sleeping in a bedroom. Also present in the home at the time were another woman and her children.

The probation report states that while Mr. Parker waited for him, Mr. Evins kicked open the bedroom door and proceeded to enter with a gun. According to the record from Mr. Evins' 2006 parole hearing, once Mr. Evins was inside the room, he awoke Mr. Rogers, ordered him to get up, and shot him once in the chest after a brief argument. Mr. Rogers died shortly after from his gunshot wound and was pronounced dead at the scene. The hearing record also states that Mr. Evins fled the scene with Mr. Parker immediately after the murder, and that shortly after the crime, Mr. Evins absconded to southern California where he was arrested six months later.

A jury convicted Mr. Evins of second-degree murder with the use of a firearm. The jury also found that Mr. Evins had a prior serious felony conviction for voluntary manslaughter. He was sentenced to 15 years to life in prison for the murder, a two-year consecutive term for the firearm enhancement, and a five-year enhancement for the previous voluntary manslaughter conviction. The latter sentence was stayed by the court.

With regard to his earlier voluntary manslaughter conviction, it occurred approximately nine years before the murder of Mr. Rogers. At his 2006 parole hearing, Mr. Evins told the Board that this killing resulted from a struggle in which he wrestled away a handgun belonging to a man that was choking his girlfriend and threatening him; once Mr. Evins took possession of the weapon, he shot the man three times, killing him. His other criminal history includes a grand-theft conviction in 1980.

Since entering state prison for Mr. Rogers' murder, Mr. Evins has been counseled three times for minor misconduct, the last of which was in 1992. To his credit, he has never been disciplined for violating prison rules, and he has worked to enhance his ability to function within the law upon release. He has taken high-school and college classes, has earned vocational certificates in Data Processing Concepts, Business Applications, Information Technologies, and Integrated Business

Glynnon Evins, D-24948
Second-Degree Murder
Page 2

Administration, and has completed several Arts in Corrections courses. He has held a variety of
institutional jobs and has availed himself of an array of self-help and therapy, including
Alcoholics Anonymous and Narcotics Anonymous since 1995, a veterans' support group, which
he co-founded, and a Hepatitis C support group. Additionally, he has volunteered to cook for an
annual children's holiday festival, to teach education classes to other inmates, and to participate
in various charitable fundraisers.

Moreover, Mr. Evins has the support of his family and others and has made realistic, confirmed
parole plans in Santa Clara County, the county to which the Board approved his release, to live
with a cousin and work at that cousin's seemingly established hot dog business. He also plans to
apply for veterans' benefits and collect social security.

But despite any positive factors that may support his parole suitability at this time, the second-
degree murder for which he was convicted was an especially heinous one because it was carried
out in a manner demonstrating callous disregard for human suffering and life. As I said in 2004
when reversing an earlier Board's decision to grant parole to Mr. Evins, he snuck into
Ms. Johnson's home, awoke Mr. Rogers, ordered him to get up, and then shot him in the chest
and left him there to bleed to death. Further, there is evidence in the record before me that this
murder involved some level of premeditation. In particular, when asked by the commissioner
during his 2006 parole hearing whether he planned on shooting the other person who he thought
was in the bedroom with Ms. Johnson, Mr. Evins stated, "possibly because we had had – this
other person had pulled a gun on me at that same house, probably within the last 48 hours of that
and robbed me." Later, at that same hearing, he said, "it was the wrong person, and I did go
there with intention to get [a different] guy … ." According to the probation report,
Mr. Evins ex-girlfriend, Marcy Johnson, told police that Mr. Evins made statements that he
would kill anyone who messed around with her. The gravity of the murder committed by Mr.
Evins is alone a sufficient basis on which to conclude presently that his release from prison
would pose an unreasonable public-safety risk.

The 2006 Board concluded that Mr. Evins committed this murder as a result of "some significant
stress" in his life at the time, noting Mr. Evins' return from Vietnam and finding himself in a life
consumed by drugs and the "sort of people that run in that particular life." Psychological reports
indicate that Mr. Evins suffered from post-traumatic stress disorder stemming from his military
service in the Vietnam War. Another psychological report, in 2003, concluded that this
condition along with his heavy cocaine use at the time impaired his judgment and led to
Mr. Rogers' murder. As I stated previously in Mr. Evins' case, without minimizing the
seriousness of post-traumatic stress disorder for Vietnam veterans, any stress he was under when
he murdered Mr. Rogers is insufficient to, at this time, tip the scales in favor of his parole
suitability.

Although Mr. Evins says that he accepts responsibility and is remorseful for Mr. Rogers' murder,
he has maintained for many years that the gun went off accidentally. His current version at least
acknowledges that he pulled the trigger, whereas his initial story to investigators was that he did
not shoot Mr. Rogers at all. As I said in 2004, Mr. Evins story has changed quite a bit over the

Glynnon Evins, D-24948
Second-Degree Murder
Page 3

years. According to a 1989 psychological evaluation, Mr. Evins reportedly had gone to Ms. Johnson's house, described as a drug house, to lend a friend some money and to collect money owed. There, when trying to wake Ms. Johnson, she startled him and caused his gun to accidentally go off, hitting Mr. Rogers who was in bed with Ms. Johnson. He claimed he did not know Mr. Rogers was in the bed at the time. According to a 1994 psychological evaluation, Mr. Evins again claimed that he did not know Mr. Rogers was in the bed, but changed the version slightly by saying that Mr. Rogers jumped up from the bed, causing the gun to accidentally go off, killing him. During the 1996 psychological evaluation, Mr. Evins stated that he had a gun with him on the day of the murder because he had been robbed previously at Ms. Johnson's house, and he shot automatically when Mr. Rogers jumped up from the bed. During the 1999 psychological evaluation, Mr. Evins stated that Mr. Rogers surprised him in a dark room, and that the shooting was accidental. During his 2000 prisoner evaluation he stated that he had a gun when he entered Ms. Johnson's room because his judgment was impaired by drugs and he thought he was being set up, and that he shot Mr. Rogers accidentally. During the 2003 psychological evaluation, Mr. Evins stated that he was carrying a gun at the time of the murder because his brother's car was shot full of bullet holes the night prior to the crime, that he could not recall why he went to the home, and that he shot Mr. Rogers after waking him up and arguing with him.

The Fresno County District Attorney's Office, like in past years, opposed Mr. Evins' parole at his most recent hearing, citing concerns that Mr. Evins' claims that both Mr. Rogers' murder and the previous voluntary manslaughter for which he was convicted were accidental.

Now age 57, after being incarcerated more than 20 years, Mr. Evins has made some encouraging gains. But given the current record before me and after carefully considering the very same factors the Board must consider, I still find that the negative factors weighing against his parole suitability continue to outweigh the positive ones tending to support it. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Evins.

Decision Date: 5/23/2006

ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT "B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of: )                       CDC Number D-24948
 )
GLYNNON EVINS )                      **INMATE**
 )
_____)        **COPY**


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 4, 2006

12:40 P.M.                     **PENDING REVIEW
                                 AND APPROVAL**

PANEL PRESENT:

Mr. Jack Garner, Presiding Commissioner
Ms. Elizabeth Richardson, Deputy Commissioner



OTHERS PRESENT:

Mr. Glynnon Evins, Inmate
Ms. Candace Christensen, Attorney for Inmate
Mr. Douglas Haas, Deputy District Attorney
Correctional Officers Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum


**Stacy Wegner, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 8 |
| Pre-Commitment Factors | 41 |
| Post-Commitment Factors | 61 |
| Parole Plans | 53 |
| Closing Statements | 97 |
| Recess | 107 |
| Decision | 108 |
| Adjournment | 113 |
| Transcriber Certification | 114 |

--oOo--

1

1          **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER RICHARDSON:**  Okay.  We

3   are on record.

4          **PRESIDING COMMISSIONER GARNER:**  This is a

5   Subsequent Parole Consideration Hearing for

6   Glynnon G-L-Y-N-N-O-N, Evins, E-V-I-N-S, CDC

7   number D-24948.  The date today is January 4,

8   2006.  The time is 12:40 p.m. and we're located

9   at the California Correctional Training Facility

10  in Soledad.  The inmate was received on March

11  10, 1986, from Fresno County, case number

12  335276.  The offense is murder in the second

13  degree with the use of firearm, count number

14  one, Penal Code Section 187 and Penal Code

15  Section 12022.5.  The term is 15 years to life

16  plus two.  The minimum eligible parole date was

17  January 21, 1996, and the date the life term was

18  October 27, 1986.  Other commitment offenses,

19  none listed.  Okay.  This hearing is going to be

20  tape recorded, and for purposes of voice

21  identification for the transcriber, I'd like

22  each participant to give their last name,

23  spelling it please, your first name, and Mr.

24  Evins, when we come to you, if you'd give us

25  your CDC number please.  I'll start and go to my

26  right.  I'm Jack Garner, G-A-R-N-E-R,

27  Commissioner.

2

1        **DEPUTY COMMISSIONER RICHARDSON:**  Elizabeth

2   Richardson, R-I-C-H-A-R-D-S-O-N, Deputy

3   Commissioner.

4        **DEPUTY DISTRICT ATTORNEY HAAS:**  Douglas

5   Haas, H-A-A-S for the last name.  I'm the chief

6   District Attorney from Fresno County.

7        **ATTORNEY CHRISTENSEN:**  Candace Christensen,

8   C-H-R-I-S-T-E-N-S-E-N, attorney for Mr. Evins.

9        **INMATE EVINS:**  Glynnon Evins, E-V-I-N-S,

10   number D-24948.

11        **PRESIDING COMMISSIONER GARNER:**  Okay.  And

12   for the record, we have two correctional peace

13   officers in the room who are here for purposes

14   of security.  Ms. Christensen, I have a BPT 1073

15   form that was signed by your client on May 26th

16   of '04, indicating that he doesn't have any

17   disability.  And if he does -- he does glasses,

18   and I notice that you have some on you today,

19   sir.

20        **ATTORNEY CHRISTENSEN:**  Actually, in my

21   discussion with him about any ADA issues, he

22   informed that he has a hearing loss, tenitus,

23   and some type of problem with mobility, and that

24   he has had toe amputation.

25        **INMATE EVINS:**  This is dealing with the VA,

26   Veterans association.

27        **PRESIDING COMMISSIONER GARNER:**  Okay.  Let

3

1   me ask, are you having any trouble hearing us

2   today?

3       **INMATE EVINS:**  No, I am not.

4       **PRESIDING COMMISSIONER GARNER:**  Okay.  Then

5   what I would ask of you at any point you do have

6   difficulty hearing today, let your attorney

7   know, and we'll call a halt to the proceedings

8   to make sure that we get a clear understanding

9   of what whomever had said to you.  Likewise, do

10  you have any difficulty sitting for a prolonged

11  periods of time?

12      **INMATE EVINS:**  No, sir.

13      **PRESIDING COMMISSIONER GARNER:**  Okay.  So

14  with those accommodations, anything else, Ms.

15  Christensen?

16      **ATTORNEY CHRISTENSEN:**  No.

17      **PRESIDING COMMISSIONER GARNER:**  Thank you.

18  This hearing is being conducted pursuant to

19  Penal Code Sections 3401 and the 3042 and the

20  rules and regulations of the Board of Parole

21  Hearings governing parole consideration hearings

22  for life inmates.  The purpose of today's

23  hearing is to consider your suitability for

24  parole.  In doing so, we'll consider the number

25  and nature of the crimes you were committed for,

26  your prior criminal and social history, and your

27  behavior and programming since your commitment.

4

1    We've had the opportunity to review your Central

2    File and your prior hearing transcript.  You'll

3    be given an opportunity to correct or clarify

4    the record.  We'll consider your progress since

5    your commitment and since your last hearing.

6    Your updated counselor's report and

7    psychological report will also be considered.

8    Any change of parole plans should be brought to

9    our attention.  We'll reach a decision today and

10   inform you whether or not we find you suitable

11   for parole and the reasons for our decision.  If

12   you're found suitable for parole, the length of

13   your confinement will be explained to you.  This

14   hearing will be conducted in two phases.  I will

15   discuss with you the crime you were committed

16   for, your prior crimes, social history, parole

17   plans, and any letters of support or opposition

18   to your parole.  Commissioner Richardson will

19   discuss with you your progress since your

20   commitment, your counselor's report, and your

21   psychological evaluation.  Once that is

22   concluded, the Commissioners, the District

23   Attorney, and your attorney will be given an

24   opportunity to ask you questions.  The questions

25   from the District Attorney shall be asked

26   through the Chair, and you should direct your

27   answers to the Panel.  Before we recess for

5

1   deliberation, the District Attorney, your

2   attorney, and you will be given an opportunity

3   to make a final statement regarding your parole

4   suitability.  Your statement should be directed

5   to why you feel you're suitable for parole.

6   We'll then recess, clear the room and

7   deliberate.  Once we've completed our

8   deliberations, we will resume the hearing and

9   announce our decision.  The California Code of

10  Regulations states that regardless of time

11  served, a life inmate shall be unsuitable for

12  and denied parole, if in the judgment of the

13  Panel the inmate would pose an unreasonable risk

14  of danger to society if released from prison.

15  Sir, you have certain rights.  Among the rights

16  are a right to a timely notice of this hearing,

17  the right to review your C file, and the right

18  to present relevant documents.  Have those

19  rights been met today?

20      **ATTORNEY CHRISTENSEN:**  Yes, they are.

21      **PRESIDING COMMISSIONER GARNER:**  Thank you,

22  very much.  You also have the right to be heard

23  by an impartial Panel.  And today the Panel was

24  myself and Commissioner Richardson.  Any

25  opposition to the Panel?

26      **ATTORNEY CHRISTENSEN:**  No.

27      **PRESIDING COMMISSIONER GARNER:**  Okay.

6

1  Thank you.  You'll receive a copy of your

2  written tentative decision today.  That decision

3  is subject to review by the Decision Review

4  Unit.  It will become affective within 120 days.

5  It is also subject to review by the Governor.  A

6  copy of the tentative decision and a copy of the

7  transcript will be sent to you.  Sir, you're

8  aware in May of 2004 they changed the appeal

9  procedure from appealing to the Board where you

10  appeal directly to the courts?

11          INMATE EVINS:  Right.

12          PRESIDING COMMISSIONER GARNER:  Thank you.

13  You're not required to admit your offense or

14  discuss your offense if you do not wish to do

15  so.  However, this Panel does accept as true the

16  findings of the Court, and you're invited to

17  discuss the facts and circumstances of the

18  offense if you desire.  The Board will review

19  and consider any prior statements you've made

20  regarding the offense in determining your

21  suitability for parole.  And at this time I'll

22  ask is there confidential material in the file

23  and if it will be used today?

24          DEPUTY COMMISSIONER RICHARDSON:  Yes,

25  there's confidential information in the inmate's

26  file.  No, there's nothing going to be used

27  today.

7

1      **PRESIDING COMMISSIONER GARNER:**  Thank you.

2   Okay.  Hearing checklist should be --

3      **ATTORNEY CHRISTENSEN:**  I have all the

4   documents thank you.

5      **PRESIDING COMMISSIONER GARNER:**  Mr. Haas.

6      **DEPUTY DISTRICT ATTORNEY HAAS:**  I'm good,

7   thank you.

8      **PRESIDING COMMISSIONER GARNER:**  Okay.  Very

9   good.  Thank you.  Anything additional to be

10  submitted today?

11     **ATTORNEY CHRISTENSEN:**  Mr. Evins has

12  brought with him a portfolio of his art work,

13  and that will be something he's submitting

14  because he would like to show you this.  It

15  represents part of his parole plans.

16     **PRESIDING COMMISSIONER GARNER:**  Okay.

17     **ATTORNEY CHRISTENSEN:**  He would like to

18  provide an explanation to some of it when we get

19  to that point.

20     **PRESIDING COMMISSIONER GARNER:**  Okay.

21  Without objection, can we afford him the time to

22  do that in closing?

23     **ATTORNEY CHRISTENSEN:**  Sure.

24     **PRESIDING COMMISSIONER GARNER:**  Closing

25  comments.

26     **ATTORNEY CHRISTENSEN:**  That's fine, thank

27  you.

8

1      **PRESIDING COMMISSIONER GARNER:**  Okay.

2  We'll be sure you get enough time to do what you

3  need to do with us today.  Okay.  Any

4  preliminary objections?

5      **ATTORNEY CHRISTENSEN:**  No, I have none.

6      **PRESIDING COMMISSIONER GARNER:**  Will Mr.

7  Evins be speaking with us today?

8      **ATTORNEY CHRISTENSEN:**  Yes, he will.

9      **PRESIDING COMMISSIONER GARNER:**  Okay.  Mr.

10  Evins, can I get you to raise your right hand,

11  please.  Do you solemnly swear or affirm that

12  the testimony you are about to give at this

13  hearing will be the truth, the whole truth, and

14  nothing but the truth?

15      **INMATE EVINS:**  I do.

16      **PRESIDING COMMISSIONER GARNER:**  Thank you,

17  very much.  Okay.  I'm going to be reading the

18  statement of the facts from the record, and the

19  record I'm going to be using, since subsequent

20  reports all have been referenced back is the

21  board report dated January 2000, which was

22  prepared by correctional counselor 1 H.

23  Farbakhsh, F-A-R-B-A-K-H-S-H.  In summary of

24  crime is as follows?

25           Patricia Wise -- excuse me --

26           during the early morning hours of

27           January 14th, 1985, Evins entered

9

1       the residence of Patricia Wise, W-

2       I-S-E, at 2329 South Poppy, P-O-P-

3       P-Y, Avenue in Fresno.  Evins

4       kicked the closed bedroom door open

5       where Otis Rogers, victim, and

6       Marcy, M-A-R-C-Y, Johnson were

7       sleeping, woke them, and commenced

8       arguing with victim Rogers.  The

9       argument escalated and Evins shot

10      and killed individual Otis Rogers

11      by means of a gunshot wound to the

12      chest.  After the shooting,

13      Patricia Wise observed the subject

14      leave victim Rogers' room with a

15      gun in his possession and exit the

16      house with a friend who had

17      remained in the living room during

18      the exchange.  After Evins left,

19      Patricia went to the bedroom,

20      opened the door, and observed that

21      Otis Rogers was bleeding from the

22      mouth and chest and Marcy Johnson

23      was unharmed.  Paramedics and the

24      police were summoned.  Rogers was

25      pronounced dead at the scene.  The

26      cause of death was hemorrhage and

27      shock due to the gunshot wound to

1            the chest.  Investigation by Fresno

2            Police Department revealed that

3            Marcy Johnson was Evins's

4            girlfriend and that he had made

5            previous statements that he would

6            kill anyone who messed around with

7            Marcy Johnson.  Evins was

8            subsequently arrested by the Van

9            Neys Police Department on July 19,

10            1985, and was transported to Fresno

11            County jail July 25th for trial.

12      So Mr. Evins, is that a fairly accurate

13 portrayal of the events of that evening?

14      **INMATE EVINS:**  Yes, sir.  That's the

15 Probation Officer's Report?

16      **PRESIDING COMMISSIONER GARNER:**  This was

17 the board report from 2000.

18      **ATTORNEY CHRISTENSEN:**  The summary of the

19 crime as it appears in the counselor's report

20 January to thousand.

21      **INMATE EVINS:**  January 2000, yes.

22      **PRESIDING COMMISSIONER GARNER:**  And again,

23 sir, the reason I use is that because subsequent

24 board reports, all they did is said nothing has

25 changed since that time, so -- okay.  Well,

26 let's start at the beginning.  How did you

27 happen to know that -- or did you know that

11

1  there was someone with Marcy Johnson?

2       **INMATE EVINS:**  I got a phone call.

3       **PRESIDING COMMISSIONER GARNER:**  At what

4  time did you get the call?

5       **INMATE EVINS:**  5:00, 5:30 in the morning.

6       **PRESIDING COMMISSIONER GARNER:**  Okay.  And

7  would this person have had the ability to have

8  the accurate information as to what they were

9  telling you?

10       **INMATE EVINS:**  Yes.

11       **PRESIDING COMMISSIONER GARNER:**  And exactly

12  what were you told, sir?

13       **INMATE EVINS:**  Initially the call came to

14  tell me about a motorcycle.  I had just let this

15  person take my car.  I had just come back from

16  the Bay Area, and I let this person take my car

17  and he went to that particular house.  It's a

18  drug house.  And that address -- this was a drug

19  house.  He went to that house and a lot of

20  activity took place there, and so he called me

21  to tell me about a motorcycle and did -- if I

22  wanted to buy this particular motorcycle.  I

23  said no, but if you want it, I'll help you get

24  it.  And then he said this guy -- this guy that

25  he had had a lot of problem with was supposed to

have been there, and so I told him to come and

me, and he did.

12

1    **PRESIDING COMMISSIONER GARNER:**  Did I

2    understand correctly that you had had problems

3    with this guy who later became --

4        **INMATE EVINS:**  It wasn't the same guy.

5        **PRESIDING COMMISSIONER GARNER:**  It wasn't

6    the same guy, so there was a misunderstanding as

7    to who was actually there?

8        **INMATE EVINS:**  Right.

9        **PRESIDING COMMISSIONER GARNER:**  Had you had

10   previous contact or problems with Mr. Rogers?

11       **INMATE EVINS:**  No.

12       **PRESIDING COMMISSIONER GARNER:**  So you

13   didn't know him?

14       **INMATE EVINS:**  No.

15       **PRESIDING COMMISSIONER GARNER:**  What time

16   of the day was this that you went there?

17       **INMATE EVINS:**  It was early in the morning.

18   It happened about 5:30 in the morning.

19       **PRESIDING COMMISSIONER GARNER:**  Okay.

20   Shortly after you received the telephone call?

21       **INMATE EVINS:**  About 20 minutes later.

22       **PRESIDING COMMISSIONER GARNER:**  The person

23   picked you up?

24       **INMATE EVINS:**  Yes.

25       **PRESIDING COMMISSIONER GARNER:**  In a car or

     n a motorcycle?

         **INMATE EVINS:**  In my car.

13

1    **PRESIDING COMMISSIONER GARNER:**  In your

2    car?  This was the one that you loaned the car

3    to?

4        **INMATE EVINS:**  My wife's car, yes.

5        **PRESIDING COMMISSIONER GARNER:**  Okay.  And

6    you drove to the residence?  Did you -- so early

7    in the morning you arrived at the residence.  Is

8    this a single family home with side yards?

9        **INMATE EVINS:**  There was people there.

10    **PRESIDING COMMISSIONER GARNER:**  No, I'm

11    trying to describe the home, sir.  Was it a

12    single family home with sides yards or was it

13    attached?

14    **INMATE EVINS:**  It was single family.

15    **PRESIDING COMMISSIONER GARNER:**  Single

16    family home, okay.  And when you got to the

17    front door, was it open or closed?

18    **INMATE EVINS:**  The front door was open.

19    **PRESIDING COMMISSIONER GARNER:**  The front

20    door was open and you say there were other

21    people in the house at that time?

22    **INMATE EVINS:**  They were in the house, yes.

23    **PRESIDING COMMISSIONER GARNER:**  How many do

24    you see -- do you recall seeing?

25    **INMATE EVINS:**  Maybe three.

26    **PRESIDING COMMISSIONER GARNER:**  Okay.  And

27    what was their state at that time?  Had they

14

1   been drinking?

2   **INMATE EVINS:**  Getting high.   There was

3   either some kids there.  Patricia Wise was

4   saying that she had two of her kids with her,

5   and they was laying on the coach.  Somebody was

6   laying on the floor, I don't remember where it

7   was.  People went back in the kitchen just

8   moving about.

9   **PRESIDING COMMISSIONER GARNER:**  So the --

10   **INMATE EVINS:**  The only person I didn't see

11   was Patricia Wise.

12   **PRESIDING COMMISSIONER GARNER:**  Okay.  The

13   kids -- the kids -- one kid was on the couch,

14   and the other was on the floor.

15   **INMATE EVINS:**  I know that now, but I

16   didn't pay attention to that until later.

17   **PRESIDING COMMISSIONER GARNER:**  How old

18   were they?

19   **INMATE EVINS:**  I think the little boy's

20   name was Dwayne or Dwight or something like

21   that, he was 11 or 12.

22   **PRESIDING COMMISSIONER GARNER:**  Okay.  And

23   this house was being used for narcotic activity

24   and also use and sales.  Is that correct?

25   **INMATE EVINS:**  Yes.

26   **PRESIDING COMMISSIONER GARNER:**  Okay.  So

27   you basically were able to just go inside the

15

1   front door?

2       INMATE EVINS:  Yes.

3       PRESIDING COMMISSIONER GARNER:  Had you

4   ever been in this house before?

5       INMATE EVINS:  Sure, several times.

6       PRESIDING COMMISSIONER GARNER:  Okay.  So

7   you knew the room layout and where different

8   things were?

9       INMATE EVINS:  Yes.

10      PRESIDING COMMISSIONER GARNER:  Okay.  You

11  found yourself at a bedroom door that was

12  closed?

13      INMATE EVINS:  After taking say -- once you

14  open the door, this particular bedroom was like

15  maybe one step inside, two at the most, inside

16  the house on the left.

17      PRESIDING COMMISSIONER GARNER:  Okay.  And

18  you had your weapon with you?

19      INMATE EVINS:  I had weapons, but I didn't

20  have it in my hand.

21      PRESIDING COMMISSIONER GARNER:  Where did

22  you -- do you recall where you had it?

23      INMATE EVINS:  Probably in my pocket or

24  something.

25      PRESIDING COMMISSIONER GARNER:  And what

26  was the weapon?

27      INMATE EVINS:  22.

16

1    **PRESIDING COMMISSIONER GARNER:**  22?

2    **INMATE EVINS:**  Yes, sir.

3    **PRESIDING COMMISSIONER GARNER:**  Pistol?

4    **INMATE EVINS:**  Pistol.

5    **PRESIDING COMMISSIONER GARNER:**  Pistol,

6 okay.  So you're immediately in the house.  The

7 door is, just as you say, a step or so from the

8 entrance?

9    **INMATE EVINS:**  Yes.

10    **PRESIDING COMMISSIONER GARNER:**  Was the

11 door -- was the bedroom door locked?

12    **INMATE EVINS:**  It didn't have a lock on it.

13 It had a eye hook and a base clothe, you know,

14 to put the clothe in there, put the door closed.

15 It wasn't very secure.

16    **PRESIDING COMMISSIONER GARNER:**  Did you

17 attempt to open the door before?

18    **INMATE EVINS:**  Well, I could see the clothe

19 in the door.  I knew it wasn't -- it's not your

20 regular door that you have at your house or I

21 would have at my mine.  It was just a place

22 clothe.  I had been in that particular room

23 several times.  A piece of paper or something

24 would just jam it closed.

25    **PRESIDING COMMISSIONER GARNER:**  Okay.  So

26 the report indicated you kicked the door?

27    **INMATE EVINS:**  No.  It didn't happen.

17

1    **PRESIDING COMMISSIONER GARNER:**  It didn't

2    happen?

3    **INMATE EVINS:**  I just got out of the VA

4    hospital.  I still had stitches in my feet, on

5    my feet, so I wasn't kicking anything.

6    **PRESIDING COMMISSIONER GARNER:**  And is that

7    the similar condition that you're dealing today

8    with your foot?

9    **INMATE EVINS:**  Well, kind of.  I'm missing

10   part of my foot.

11   **PRESIDING COMMISSIONER GARNER:**  Okay.  So

12   then I'll ask you, how did you get through the

13   door?

14   **INMATE EVINS:**  Just pushed the door open.

15   **PRESIDING COMMISSIONER GARNER:**  Just used

16   body force?

17   **INMATE EVINS:**  Yes.

18   **PRESIDING COMMISSIONER GARNER:**  Okay.  And

19   when you first got into the bedroom, were you

20   able to identify who was in the bed?

21   **INMATE EVINS:**  No.

22   **PRESIDING COMMISSIONER GARNER:**  Were they

23   under covers?

24   **INMATE EVINS:**  It was dark.

25   **PRESIDING COMMISSIONER GARNER:**  It was

26   dark?

27   **INMATE EVINS:**  Yes.

18

1        **PRESIDING COMMISSIONER GARNER:**  Okay.  No

2  lights on in the room at all?

3        **INMATE EVINS:**  No.

4        **PRESIDING COMMISSIONER GARNER:**  Were there

5  background lights from the room that you first

6  entered?

7        **INMATE EVINS:**  Yes.

8        **PRESIDING COMMISSIONER GARNER:**  So the

9  background lights would of been behind you?

10        **INMATE EVINS:**  Yes.

11        **PRESIDING COMMISSIONER GARNER:**  Any windows

12  that were not draped?

13        **INMATE EVINS:**  It was just two windows on

14  each wall.  There was a window on each wall, and

15  they were draped.

16        **PRESIDING COMMISSIONER GARNER:**  They were

17  draped.  At any point when you entered the room

18  did either of the occupants of the bed realize

19  that you were there?

20        **INMATE EVINS:**  Yes.

21        **PRESIDING COMMISSIONER GARNER:**  Was that

22  before or after -- did you have to say something

23  to awaken them?

24        **INMATE EVINS:**  It was just a mattress on a

25  floor.  It wasn't even a bed.  It was just a

26  mattress.

27        **PRESIDING COMMISSIONER GARNER:**  Okay.

19

1      INMATE EVINS:  And I kicked the mattress

2  with my other foot.

3      PRESIDING COMMISSIONER GARNER:  Okay.

4      INMATE EVINS:  I kind of stumbled into it,

5  really.

6      PRESIDING COMMISSIONER GARNER:  Okay.  Do

7  you recall what side the victim was on?

8      INMATE EVINS:  On the far side.  He was on

9  -- this is Marcy Johnson.  He was on the other

10  side of Marcy Johnson.

11      PRESIDING COMMISSIONER GARNER:  Okay.  Were

12  you standing at the foot of the bed or on the

13  side?

14      INMATE EVINS:  I was standing on the side.

15      PRESIDING COMMISSIONER GARNER:  On whose

16  side?

17      INMATE EVINS:  On Marcy's side.

18      PRESIDING COMMISSIONER GARNER:  Okay.  So

19  you kicked -- at that time you then kicked the

20  bed with your good foot?

21      INMATE EVINS:  Yes.

22      PRESIDING COMMISSIONER GARNER:  And that

23  caused one or both --

24      INMATE EVINS:  I didn't really raise my

25  foot back and kick.  I kind of stumbled into it.

26      PRESIDING COMMISSIONER GARNER:  Okay.  You

27  let them know you were there?

20

1    INMATE EVINS:  Yes.

2    PRESIDING COMMISSIONER GARNER:  Okay.  Did

3  they both wake at the same time or --

4    INMATE EVINS:  Yes.

5    PRESIDING COMMISSIONER GARNER:  Okay.  And

6  what was the first thing that was said when they

7  were awakened?

8    INMATE EVINS:  I don't quite remember.  I

9  don't know who spoke first.  I'm sure I did.  I

10  asked Marcy about some money, where's my money

11  or something like that, because she owed me a

12  bunch of money.

13    PRESIDING COMMISSIONER GARNER:  What did

14  she owe you money from?

15    INMATE EVINS:  She owed me for -- I gave

16  her some drugs.

17    PRESIDING COMMISSIONER GARNER:  Okay.  And

18  you were dealing at the time?

19    INMATE EVINS:  I was, yes, using and

20  dealing.

21    PRESIDING COMMISSIONER GARNER:  Did you

22  have -- I'll get to it later, but at this time

23  just ask you, were you employed at this time or

24  was drug sales your --

25    INMATE EVINS:  Drug sales, that was just

26  the extent of it.

27    PRESIDING COMMISSIONER GARNER:  You were

1   supported by drug sales?

2       INMATE EVINS:  Uh-huh.

3       PRESIDING COMMISSIONER GARNER:  So you at

4   some point after awakening them asked Marcy

5   about the money?

6       INMATE EVINS:  Yes.

7       PRESIDING COMMISSIONER GARNER:  And do you

8   recall if she had a reply?

9       INMATE EVINS:  She was startled, and they

10  both jumped up at the same time.  As a matter of

11  fact, I think -- once I went into the room I was

12  expecting someone else.  I was expecting this

13  guy named Lenny Newhouse (phonetic).  This is

14  the guy I went there looking for, and I did -- I

15  still didn't know this wasn't him, but when the

16  guy, you know, I had -- if this was a revolver

17  that I had, and then I had the (indiscernible)

18  pulled back, you know, because I was expecting

19  some problems too.  And like I said, I was

20  looking for somebody else that I had already had

21  some serious problems with, so when this guy

22  jumped, that's why I said it was an accident.  I

23  guess it wasn't because I went there with a gun,

24  so it really wasn't an accident, but I -- it was

25  the wrong person.

26      PRESIDING COMMISSIONER GARNER:  Okay.  So

27  this person, the victim now, sits up in bed or

1  did he get up?

2      INMATE EVINS:  He jumped up.

3      PRESIDING COMMISSIONER GARNER:  He jumped

4  up out of bed.  Okay.  Do you recall was this

5  person the same size you were, bigger or

6  smaller?

7      INMATE EVINS:  Taller.

8      PRESIDING COMMISSIONER GARNER:  He was

9  taller.  Okay.  Do you recall how long after you

10  were first in the room and nudged the bed

11  causing them to awake before this individual

12  jumped up?

13      INMATE EVINS:  All this happened -- the

14  whole thing took place in less than three or

15  four minutes.

16      PRESIDING COMMISSIONER GARNER:  Okay.  So

17  he jumps up out of bed?

18      INMATE EVINS:  He don't even -- he don't --

19  he never stood up.  This was a mattress on the

20  floor.

21      PRESIDING COMMISSIONER GARNER:  Right.

22      INMATE EVINS:  When he jumped up -- as a

23  matter of fact, I even asked the guy -- the gun

24  went off.  I know I pulled -- I was high, and

25  when I shot the guy, I asked him -- after I

26  pulled the gun, I asked him "were you hit, did

27  you get shot."  This all was in the police

1  report. And this was the statement that Marcy

2  made, you know, she made the same statement

3  because I really didn't know I had shot him.  I

4  didn't know -- I knew from -- from the gun but,

5  I didn't know he was hit.

6      PRESIDING COMMISSIONER GARNER:  Okay.  So

7  at what time did you take the gun out when you

8  entered the room?

9      INMATE EVINS:  Probably on the way to the

10  bed.

11      PRESIDING COMMISSIONER GARNER:  On the way

12  to the bed?

13      INMATE EVINS:  Yes.

14      PRESIDING COMMISSIONER GARNER:  So he is in

15  the process of getting up when the gun goes off?

16      INMATE EVINS:  He jumped up.

17      PRESIDING COMMISSIONER GARNER:  He jumped

18  up?

19      INMATE EVINS:  Yes.

20      PRESIDING COMMISSIONER GARNER:  But he

21  wasn't standing?

22      INMATE EVINS:  When he heard me, when

23  someone -- he realized, I guess, somebody else

24  was in the room talking to Marcy, and he jumped

25  up.

26      PRESIDING COMMISSIONER GARNER:  Okay.  What

27  did he say when you asked him if he had been

24

1  hit?

2    **INMATE EVINS:**  He said, why did you shoot

3  me.

4    **PRESIDING COMMISSIONER GARNER:**  You knew

5  you did at that point, you knew that you had

6  shot him?  Did you say anything else to him?

7    **INMATE EVINS:**  Yes, I did.  I don't

8  remember what it was though, yes, I did.

9    **PRESIDING COMMISSIONER GARNER:**  Okay.  But

10  you --

11    **INMATE EVINS:**  I kind of -- it shocked me

12  too.  You know, it kind of like -- it didn't go

13  into shock, but, you know, the realization of it

14  kind of hit me not to the fullest degree, but I

15  done shot in guy.

16    **PRESIDING COMMISSIONER GARNER:**  Okay.

17    **INMATE EVINS:**  And I knew it was the wrong

18  guy.

19    **PRESIDING COMMISSIONER GARNER:**  And you

20  were on drugs at the time?

21    **INMATE EVINS:**  Yes.

22    **PRESIDING COMMISSIONER GARNER:**  When did

23  you last use drugs before this shooting?

24    **INMATE EVINS:**  All night long for days,

25  every day, for days.

26    **PRESIDING COMMISSIONER GARNER:**  Okay.  So

27  he's shot, you know he's shot?

1      INMATE EVINS:  Yes.

2      PRESIDING COMMISSIONER GARNER:  What did

3   you do then?

4      INMATE EVINS:  I turned around.  There was

5   a conversation, I don't remember exactly what

6   happened.  I asked him was he shot.  He said,

7   why did you shoot me, and I said something about

8   you caused this or something to that effect.

9   And a about the same time, I guess, somebody

10   else in the room, Kenny, the guy that had come

11   picked me up, he was at the door.  He said, man,

12   let's go, let's go, let's go, and I maybe

13   hesitated, and then I left out.  I went to

14   another house and passed out.

15      PRESIDING COMMISSIONER GARNER:  So you left

16   with Kenny?

17      INMATE EVINS:  Yes.

18      PRESIDING COMMISSIONER GARNER:  Did he

19   drive or did you drive?

20      INMATE EVINS:  He drove.

21      PRESIDING COMMISSIONER GARNER:  He drove.

22   How far did you drive before you stopped at this

23   other house?

24      INMATE EVINS:  There's another area called

25   Bigmy Village, which is probably three or four

26   blocks away or so.

27      PRESIDING COMMISSIONER GARNER:  Whose house

1  was that?

2      INMATE EVINS:  I don't know her real name.

3  We called OZ, and this was another drug house.

4      PRESIDING COMMISSIONER GARNER:  Okay.  So

5  you knew them well enough that you were able to

6  go there?

7      INMATE EVINS:  Sure.

8      PRESIDING COMMISSIONER GARNER:  And like

9  you said, you just -- passed out?

10     INMATE EVINS:  I kind of just slid down the

11 wall -- I just slid down the wall and just kind

12 of collapsed.  That's when it really hit me.

13 The impact of it just kind of hit me.

14     PRESIDING COMMISSIONER GARNER:  At any

15 point after you shot Mr. Rogers, did you think

16 about calling for aid or offering aid?

17     INMATE EVINS:  I heard -- I heard Marcy

18 holler, somebody tell them to go get the

19 ambulance.

20     PRESIDING COMMISSIONER GARNER:  Okay.  Did

21 Marcy say anything to you after you shot him?

22     INMATE EVINS:  No, not that I know of.

23     PRESIDING COMMISSIONER GARNER:  Okay.

24     INMATE EVINS:  I was just kind of numb

25 after that.

26     PRESIDING COMMISSIONER GARNER:  So the

27 house that you went to that you say was fairly

1   close, three or four blocks, did I hear you say?

2       INMATE EVINS:  Maybe a little bit further,

3   it was close.

4       PRESIDING COMMISSIONER GARNER:  Okay.  As

5   you were going to that house, did you have any

6   understanding of hearing sirens at that point?

7       INMATE EVINS:  No.

8       PRESIDING COMMISSIONER GARNER:  Didn't hear

9   any sirens?

10      INMATE EVINS:  Didn't hearing nothing.

11      PRESIDING COMMISSIONER GARNER:  So you were

12  at this drug house and you kind of slid down the

13  wall and collapsed?

14      INMATE EVINS:  Yes.

15      PRESIDING COMMISSIONER GARNER:  Okay.  When

16  did you -- when did you regain consciousness?

17      INMATE EVINS:  Shortly after that, I guess.

18  Shortly after, probably 5, 10 minutes.

19      PRESIDING COMMISSIONER GARNER:  So this

20  would of been early in the morning?

21      INMATE EVINS:  Early in the morning

22  (indiscernible).

23      PRESIDING COMMISSIONER GARNER:  Okay.  When

24  you regained consciousness what were your first

25  thoughts?

26      INMATE EVINS:  I wanted to call my wife.

27  As a matter of fact, I think that's probably

1  what I did do, and she was just devastated.

2     PRESIDING COMMISSIONER GARNER:  Did you

3  tell her what had happened?  And at that point

4  did you have any knowledge of the condition of

5  Mr. Rogers?

6     INMATE EVINS:  No.

7     PRESIDING COMMISSIONER GARNER:  Okay.  So

8  where did you go from there?

9     INMATE EVINS:  I stayed there for hours.  I

10  stayed there probably until 9:00 or 10:00 in the

11  morning, and then this girl, Donna Hacket

12  (phonetic), she took me because Kenny had gone.

13  I told him to give -- it was my wife's car that

14  he was driving, so he took the car back to her

15  and to take her to help her, you know, to help

16  her to do whatever it was that she had to do.

17  And so I had this other girl, Donna Hacket, she

18  was just running me around the rest of the day.

19  So I left -- I left Fresno probably that night,

20  that evening, and went down to the Bay Area.

21     PRESIDING COMMISSIONER GARNER:  Okay.  What

22  did you do to the weapon?

23     INMATE EVINS:  I gave it to Kenny.

24     PRESIDING COMMISSIONER GARNER:  You gave it

25  to Kenny?

26     INMATE EVINS:  So he would throw it away.

27     PRESIDING COMMISSIONER GARNER:  Do you have

1    any knowledge of what he did with it?

2        INMATE EVINS:  He didn't throw it away

3    because he came to visit me in Oakland one time

4    and he brought it with him.

5        PRESIDING COMMISSIONER GARNER:  Okay.  So

6    after this you went up to the Bay Area?

7        INMATE EVINS:  Yes.

8        PRESIDING COMMISSIONER GARNER:  How did you

9    happen to go there?

10        INMATE EVINS:  This girl, this Donna Hacket

11    took me up there.

12        PRESIDING COMMISSIONER GARNER:  Did you

13    know anyone up there?

14        INMATE EVINS:  I knew a lot of people up

15    there.

16        PRESIDING COMMISSIONER GARNER:  Okay.

17        INMATE EVINS:  That's where I really was

18    from.

19        PRESIDING COMMISSIONER GARNER:  Okay.

20    Where did you stay up there?

21        INMATE EVINS:  I don't know the address.  I

22    just --

23        PRESIDING COMMISSIONER GARNER:  What city?

24        INMATE EVINS:  Oakland.

25        PRESIDING COMMISSIONER GARNER:  Oakland,

26    okay.  And did you continue to use drugs during

27    this period?

1    **INMATE EVINS:** Yes, I did, more.

2    **PRESIDING COMMISSIONER GARNER:** And you

3    were supporting that use through --

4    **INMATE EVINS:** Friends. I didn't -- I

5    wasn't -- I didn't -- I wasn't buying most of

6    the drug that I had. I didn't have to buy them.

7    It was just so common, you know, especially back

8    in that particular time.

9    **PRESIDING COMMISSIONER GARNER:** Okay. Any

10    point in time when you were up in the Bay Area

11    that you gave consideration to coming back to

12    Fresno?

13    **INMATE EVINS:** Every day.

14    **PRESIDING COMMISSIONER GARNER:** Okay. Let

15    me ask you, when did you find out that Mr.

16    Rogers had died?

17    **INMATE EVINS:** Maybe later that day.

18    **PRESIDING COMMISSIONER GARNER:** And how did

19    you find that out?

20    **INMATE EVINS:** By phone.

21    **PRESIDING COMMISSIONER GARNER:** Someone in

22    the Fresno area told you that he had died. So

23    every day you gave some consideration to return

24    to Fresno for settling up?

25    **INMATE EVINS:** My family was there and I

26    wanted -- my wife was trying to get me to turn

27    myself in, and I paid attention to her, but I

1   just couldn't do it.

2       **PRESIDING COMMISSIONER GARNER:**  And I guess

3   -- and it looks like at some point you found

4   ourself in southern California.  They say the

5   Van Neys Police Department was actually the Los

6   Angeles PD?

7       **INMATE EVINS:**  I was -- it was at the

8   airport that I was --

9       **PRESIDING COMMISSIONER GARNER:**  Oh.  At the

10  Van Neys Airport?

11      **INMATE EVINS:**  At the LA Airport.

12      **PRESIDING COMMISSIONER GARNER:**  The LA

13  Airport?

14      **INMATE EVINS:**  Yes.

15      **PRESIDING COMMISSIONER GARNER:**  Was it the

16  airport police that got you?

17      **INMATE EVINS:**  I think so.  It wasn't me

18  that they bust.  It was some people that I was

19  with, and I just happened to be there.

20      **PRESIDING COMMISSIONER GARNER:**  So they ran

21  a check on you and that's when they --

22      **INMATE EVINS:**  No, that's when I told them.

23      **PRESIDING COMMISSIONER GARNER:**  You told

24  them who you was?

25      **INMATE EVINS:**  Yes.

26      **PRESIDING COMMISSIONER GARNER:**  Did you

27  tell them what you'd done?

32

1      INMATE EVINS:   No.

2      PRESIDING COMMISSIONER GARNER:   So then --

3      INMATE EVINS:   And then they took me to Van

4   Neys and held me until Fresno expedite me back

5   to Fresno.

6      PRESIDING COMMISSIONER GARNER:   Okay.   Was

7   this -- were you guys in a vehicle?

8      INMATE EVINS:   Yes.

9      PRESIDING COMMISSIONER GARNER:   What was

10   the original traffic stop for?

11      INMATE EVINS:   I don't know any of the

12   people that are from LA.   I didn't know any of

13   them really well, but they were doing stuff for

14   airline tickets.   They were doing some type of

15   thing with airline where they would give them

16   tickets with credit cards and you sell them.

17   They had a clientele of people to be selling the

18   airline tickets.

19      PRESIDING COMMISSIONER GARNER:   So the

20   Fresno police came down and picked you up, took

21   you back to Fresno?

22      INMATE EVINS:   I don't think that's how it

23   was.   I think they just put me on the bus or

24   something.   They didn't come and pick me up.

25      PRESIDING COMMISSIONER GARNER:   But you

26   wound up in Fresno County jail?

27      INMATE EVINS:   Yes.

1    **PRESIDING COMMISSIONER GARNER:**  Okay.

2    During this period of time that you were -- I'm

3    going to go ahead and state that you were on the

4    run from this offense, how often did you talk

5    with your wife?

6        **INMATE EVINS:**  A few times.

7        **PRESIDING COMMISSIONER GARNER:**  Okay.  Did

8    she continue to encourage you to surrender

9    yourself?

10       **INMATE EVINS:**  Yes.

11       **PRESIDING COMMISSIONER GARNER:**  Did you

12   ever take possession of the weapon again?  So

13   you don't know if that weapon, was it ever

14   found?

15       **INMATE EVINS:**  No, it was -- as a matter of

16   fact, I did, I'm sorry.  I did it take it back.

17   I took it when he brought it down.  I asked him

18   what he did with it.  He said I have it.  I

19   said, what are you doing with this thing.  I

20   said, give it to me.  I break it down into about

21   four pieces, put it in the garbage bag, and put

22   it in the garbage truck.

23       **PRESIDING COMMISSIONER GARNER:**  Okay.

24   What's your level of experience with that

25   weapon?

26       **INMATE EVINS:**  With that particular?

27       **PRESIDING COMMISSIONER GARNER:**  Right.

34

1       **INMATE EVINS:**  It was the first time I
2   fired it.

3       **PRESIDING COMMISSIONER GARNER:**  So it was
4   the first time.  And where did you get that gun?

5       **INMATE EVINS:**  From Trader's Gun Store in
6   San Diego.

7       **PRESIDING COMMISSIONER GARNER:**  So you went
8   through a righteous purchase?

9       **INMATE EVINS:**  I didn't go through it
10  myself.  It was the same person that I was
11  getting all my drugs back in Oakland.  They
12  bought about five or six of these things at the
13  same time, bullet proof protectors.  Did you
14  purchase it or did they give it to you?

15      **INMATE EVINS:**  I got it --

16      **PRESIDING COMMISSIONER GARNER:**  Okay.  And
17  at that time Marcy Johnson, was she your
18  girlfriend?

19      **INMATE EVINS:**  No, she wasn't.

20      **PRESIDING COMMISSIONER GARNER:**  Had she
21  ever been?

22      **INMATE EVINS:**  She never was.

23      **PRESIDING COMMISSIONER GARNER:**  Never was?

24      **INMATE EVINS:**  We had a drug relationship.

25      **PRESIDING COMMISSIONER GARNER:**  Drug
26  relationship?

27      **INMATE EVINS:**  Yeah.

35

1    **PRESIDING COMMISSIONER GARNER:**  Okay.

2    You've discussed this a number of times?

3    **INMATE EVINS:**  That's right.

4    **PRESIDING COMMISSIONER GARNER:**  Is there

5    anything about this crime that we haven't

6    touched on today that you think would be

7    important for this Panel to know?

8    **INMATE EVINS:**  Well, I had -- the last time

9    I was at the Board and I didn't talk about the

10   crime because I figured -- because I had

11   discussed it enough, but I never went into these

12   much details.  I never went into that much

13   details as now, but I think it's been covered

14   back and forth, back and forth, and unless you

15   have anything that you want to ask me, I don't

16   have -- I can't think of anything.

17   **PRESIDING COMMISSIONER GARNER:**  Well, in

18   light of what you just said, have any of the

19   question that I've asked you today triggered

20   anything else that you haven't talked about

21   today?

22   **INMATE EVINS:**  No, sir.

23   **PRESIDING COMMISSIONER GARNER:**  Okay.

24   Thank you.  Okay.  Let's take a look at some

25   prior crimes.

26   **INMATE EVINS:**  I would like to say

27   something, and I don't mean to minimize

36

1   anything, but Patricia Wise is the main witness

2   for the District Attorneys, and during the

3   course of the trial, during the police report,

4   preliminary, and trial, she was the only witness

5   that got up and -- that tolded a different story

6   every time.  And everything she said about me

7   was wrong, and the last -- during trial even the

8   DA called a halt in the proceedings and said,

9   your Honor, we have no eyewitness

10  identification, all we have (indiscernible)

11  agreement.  And then they were put her back on

12  the stand, and she said I lied here, and I lied

13  here, and I lied here, and lied here, and I'm

14  here today telling the truth, and -- but this is

15  the Probation Officer's Report that they used,

16  and so that was most (indiscernible) for

17  anything I've said, everything I've said, every

18  story that everybody told during this whole

19  course of this thing was a lie, you know,

20  everybody -- the whole thing was just nothing

21  but lies, so when I got to trial -- I mean, when

22  I came before the Court and I didn't know what

23  to say, you know, I couldn't say, well, I did it

24  because then I was -- my attorney -- I had a

25  attorney named Marvin Schutz, and then -- are

26  you pleading insanity.  No, I'm not, I'm not

27  pleading insanity.  And then he plead the case

1    on me on the fact that I wasn't Jerry, because

2    this was the name that I used was Jerry.  Okay,

3    so the whole thing was fought on the basis that

4    I wasn't this person Jerry, so I just went along

5    with that.  I just went along with what the

6    attorney said but I did -- I was the shooter.

7         **ATTORNEY CHRISTENSEN:**  Was this crime an

8    accident?

9         **INMATE EVINS:**  No.  To the extent that I

10   had the gun and I went there looking for

11   someone, it wasn't an accident, but the wrong

12   person got shot.  I didn't go there to shoot --

13   I didn't know Otis Rogers.  I didn't know this

14   particular guy.  Otis Rogers, Eddie Rogers, Otis

15   Rogers's brother was here with me at Soledad for

16   like five years, and he was the one that the

17   police went to when -- the same morning of the

18   crime when they left that particular -- he came

19   to that particular house because somebody had

20   called and said your brother had got shot there,

21   so he went to the house.  This detective G.

22   Burla (phonetic), I think that was his name,

23   explained -- he told me, if you come to my house

24   later on today I'll have three or four people

25   that will verify that this guy and my brother

26   got into an argument somewhere in the street two

27   or three weeks ago and his brother -- this guy

38

1    said he was going to kill my brother.  So the

2    detective went to this guy's house.  He had a

3    guy named Lacy Gibson and two other guys there

4    to verify.  Now, I believe everything that they

5    said, that they told these detectives.  I

6    believe everything, but that particular person

7    that they were talking about wasn't me.  You

8    know, because they talked about the car.  They

9    talked about the address 1111 Drummer Street and

10   I know the guy that lived there.  I had never

11   been to that address.  I ran into -- they

12   brought one of these guys from Susanville to

13   testify against me.  I ran into him at the

14   county jail, someone pointed him out.  I didn't

15   know him.  Somebody in the chow hall line --

16   somebody pointed him out and said that's one of

17   the guys right there.  That's the guy right

18   there.  And I said who.  So he said the guy with

19   the braids in the hair.  So all these guys have

20   braids if their hair, so he called the guy to

21   the fence.  We shook fingers through the fence

22   and he told me -- I asked this guy, I said, do

23   you know me.  He said I don't know you.  And one

24   of the officers said, or told me, go sit down,

25   so I -- excuse me, have you ever seen me before.

26   He said, man, I said I don't know you.  So they

27   brought this guy to testify against -- this is

39

1  one of the guys that really -- the detectives

2  went to talk you. And he said man, I said I

3  don't know. He said no. The next week when the

4  trial resumed, he don't show up. And I ask my

5  attorney, I said what happened to this guy Lacy

6  Gibson, he said well, he was too all over the

7  board so the DA didn't want to use him. But at

8  the same time they put that particular person

9  after he came to testify again it wasn't me.

10 Now, I ran into this same brother, Otis's

11 brother in the county jail. He's the one that

12 called the detective and had all these people

13 that say he talked about me. Now, I ran into

14 him in the county jail and it just so happen I

15 didn't know him either. We had never seen each

16 other. They had us in the same holding tank.

17 This is in the records too. I had two Morrison

18 hearings and they had us in front of the George

19 Growins Court, and they had us in the same

20 holding cell, and this guy like to talk to me

21 death, and I'm trying to read my stuff and

22 certain things that he said it kind of triggered

23 something and he was talking about -- he was

24 talking about his brother being killed, his

25 brother being killed and this. And then when

26 they came and they culled his name out of the

27 holding cell, they said Rogers. And I said wow,

40

1   that's the same name.   And then -- with my file

2   and Eddie Rogers.   This is the same guy.   I

3   didn't know him.   He didn't know me.   Me and him

4   was here at Soledad and we used to walk the

5   track together.   We used to sit at the same chow

6   hall and certain things, certain things, we

7   could just talk every morning.   We'd be at chow

8   and we would talk about certain things.   This is

9   the same guy.   I didn't even recognize him from

10  the county jail.   But he tell me certain things.

11  I mean, he's from Fresno, and I ran into other

12  guys from Fresno, and certain things, again, I

13  wanted to go and talk to this guy.   I really --

14  ma'am, I talked to several personal friends of

15  mine, and I wanted to let this guy know, that

16  man, I'm sorry.   I'm sorry to what happened to

17  your brother.   He was here in prison for a

18  serious case.   He had -- he had abducted the guy

19  that he thought that killed his brother and did

20  some serious harm to this guy, and then later he

21  came to me right before he left.   He finally got

22  out after almost 19 years.   He had a kidnapping

23  with great bodily harm.   He got out of the

24  prison, but before he left he said man, he came

25  to me and he said, you know what, man, he said,

26  they finally got the guy that killed my brother.

27  I said what.   He said, yeah, they got the guy.

41

1    He's in Folsom.  The guy that killed my brother.

2    I said no, so I never did tell him that I was

3    the guy because -- one day I'm going to run into

4    him.  His family.  I mean, I want to talk to

5    him.  I've always wanted to write his family.

6    There was a woman -- there was an older black

7    woman in the back of the courtroom every day

8    that I went there and -- a grandmotherly looking

9    woman.  She was there every day, and I know she

10   was part of that family.  And I don't know if

11   she's still alive or what, but one day I'm going

12   to talk to that family.  I want to talk to that

13   family.

14       **PRESIDING COMMISSIONER GARNER:**  Let me

15   summarize for the record that you did not know

16   Mr. Rogers?

17       **INMATE EVINS:**  No, I didn't.

18       **PRESIDING COMMISSIONER GARNER:**  When you

19   went to the house?

20       **INMATE EVINS:**  No, I didn't.

21       **PRESIDING COMMISSIONER GARNER:**  Never met

22   him?

23       **INMATE EVINS:**  No, I didn't.

24       **PRESIDING COMMISSIONER GARNER:**  Okay.  I'll

25   go now to your prior criminal conduct, and that

26   was first of all, that the record reflects that

27   you have no juvenile record?

42

1      **INMATE EVINS:**  No.

2      **PRESIDING COMMISSIONER GARNER:**  And that

3  adult convictions of November 29, 1974, you were

4  arrested for 187, PC murder, you plead guilty

5  and convicted of voluntary manslaughter on

6  October 30th, 1975, sentenced to 60 months

7  probation, a year in county jail, and placed on

8  a 120 days of probation.

9      **INMATE EVINS:**  No.  I did a 90 day

10  observation at Vacaville.  They brought me back

11  and sentenced me to a year in county.

12      **PRESIDING COMMISSIONER GARNER:**  Okay.  So

13  you did a year in county jail?

14      **INMATE EVINS:**  No.  They gave me credit for

15  the 90 day and I did about five months.

16      **PRESIDING COMMISSIONER GARNER:**  What was

17  this offense involving?

18      **INMATE EVINS:**  More street stuff.  I was

19  deeply rooted into streets, and this is where my

20  livelihood came from.  I got out of the service,

21  came home from Vietnam, I got out of the service

22  and I did all the work things.  I worked at

23  Granny Goose.  I owned my little company.  I had

24  a Vietnam Veterans home improvement company.  I

25  had a tropical fish store.  I tried.  I was in

26  and out of the -- I had been in and out of the

27  VA hospital for like a total of 11 times for

43

1  different surgeries due to the service, and I

2  couldn't maintain a job. I couldn't maintain

3  the job. I was -- I couldn't focus. I couldn't

4  do anything. I went through the same thing that

5  I now know that a lot of Veterans went through,

6  and I started -- the more I got into drugs, I

7  got away from working, I got more into drugs. I

8  was running around in the streets, and so this

9  is where I'm hustling more or less. I'm doing

10  whatever I can out there to survive in the

11  street, and so I was meeting the kind of people

12  like myself. I was meeting the same crazy

13  people like I thought I was -- I didn't think

14  about me being crazy, but I was dealing with the

15  same kind of people just like myself, birds of a

16  feather flock together, and this is the same

17  kind of dangerous people that I -- I was the

18  same dangerous person that the people that I was

19  running around with, you know, so these are the

20  kind of people that I came in contact with all

21  the time.

22      **PRESIDING COMMISSIONER GARNER:** Okay. At

23  any point during this when you maybe had a

24  couple days where you weren't using and sobered

25  up a little bit, did you --

26      **INMATE EVINS:** I went to jail.

27      **PRESIDING COMMISSIONER GARNER:** You went to

44

1   jail?

2       **INMATE EVINS:**  Yes, county jail, yes.

3       **PRESIDING COMMISSIONER GARNER:**  Did you

4   kind of take stock of where you are in your life

5   at that time?

6       **INMATE EVINS:**  It was bad.  It was all bad.

7   It was all bad.

8       **PRESIDING COMMISSIONER GARNER:**  And the

9   record also indicates that on September 4 you

10  were arrested for a grand theft, and this one

11  indicates that you were convicted and sentenced

12  to, again, probation.

13      **INMATE EVINS:**  No.  That was -- I plead

14  guilty to it.  It was a -- it was an apartment

15  building that I had.  The owner -- the previous

16  owner had gave me this (indiscernible) or

17  something and the new people took over, and I

18  probably had sold it or gave it away, and that's

19  what the grand theft was.  It wasn't no money or

20  taking anything from, you know, it had something

21  to do with like a (indiscernible) or something.

22      **PRESIDING COMMISSIONER GARNER:**  Yeah.  I

23  stand corrected.  I was using the board report.

24  Your rap sheet does indicate that you plead

25  guilty.  July of '85, the police department in

26  Los Angeles, and looks like it might of been

27  involved in the traffic stop at the airport.

45

1        INMATE EVINS:  Right.

2        PRESIDING COMMISSIONER GARNER:  It says

3    credit forgery that was --

4        INMATE EVINS:  I had no credit cards.

5        PRESIDING COMMISSIONER GARNER:  Yes.

6        INMATE EVINS:  It was just the people that

7    I was with.

8        PRESIDING COMMISSIONER GARNER:  Yeah, it

9    was dismissed and, of course, that brings us to

10   the crime itself.

11       INMATE EVINS:  Yes.

12       PRESIDING COMMISSIONER GARNER:  Did I see

13   somewhere that this arrest of the 187 that got

14   reduced to manslaughter involved some kind of a

15   street situation where you were challenged or

16   there was some issue that you had with a person?

17       INMATE EVINS:  Yes.

18       PRESIDING COMMISSIONER GARNER:  What was

19   that, sir?

20       INMATE EVINS:  A guy named Richard Bass, he

21   was out here from Ohio.  He just got out of the

22   penitentiary back there, about 10 years older

23   than myself, and I knew him slightly, and he --

24   well, my girlfriend -- he was looking for me for

25   some particular reason.  We didn't have any, you

26   know, and she said something smart to him, so he

27   grabbed her and he choked her and he tried to