# EXHIBIT B
# Part 2 of 3

46

1  take her purse.  He tried to take her money

2  away, and I just happen to come up and we get

3  into a big argument.  I knew this guy carried a

4  gun all the time, and I saw him going to his

5  pocket.  Me and him got into a scuffle and we

6  were wrestling over this gun, and I shot him.

7      **PRESIDING COMMISSIONER GARNER:**  With his

8  gun?

9      **INMATE EVINS:**  Yes.

10      **PRESIDING COMMISSIONER GARNER:**  You didn't

11  have a weapon on your at that time?

12      **INMATE EVINS:**  No.

13      **PRESIDING COMMISSIONER GARNER:**  Did he die

14  at the scene or later?

15      **INMATE EVINS:**  He died later.

16      **PRESIDING COMMISSIONER GARNER:**  Later?

17      **INMATE EVINS:**  Uh-huh.

18      **PRESIDING COMMISSIONER GARNER:**  What city

19  was this in?

20      **INMATE EVINS:**  This was in Oakland.

21      **PRESIDING COMMISSIONER GARNER:**  In Oakland?

22      **INMATE EVINS:**  Yes.

23      **PRESIDING COMMISSIONER GARNER:**  Okay.

24      **INMATE EVINS:**  Oakland is a very violent

25  city.

26      **PRESIDING COMMISSIONER GARNER:**  Okay.  A

27  lot of people don't do it there too.

47

1    **INMATE EVINS:**  Right.

2    **PRESIDING COMMISSIONER GARNER:**  Okay.  So

3    as far as your personal factors, you're the

4    oldest of two children born to Joe and Madeline,

5    M-A-D-E-L-I-N-E, Evins in Berkeley, California,

6    and you were born on December 3rd, 1948?

7    **INMATE EVINS:**  Yes.

8    **PRESIDING COMMISSIONER GARNER:**  During a

9    subsequent birth your mother died when you were

10   nine months old.  Subsequently, you were

11   alternately raised by grandmother in Louisiana?

12   **INMATE EVINS:**  Yes.

13   **PRESIDING COMMISSIONER GARNER:**  And your

14   father in Kansas City, Missouri.  And you

15   described your father as a very disturbed man

16   who was distant from him with no intimate

17   relationship.  Is that correct?

18   **INMATE EVINS:**  That's true.

19   **PRESIDING COMMISSIONER GARNER:**  What was

20   the last recollection that you had of your

21   father when you were growing up?

22   **INMATE EVINS:**  Trying to get away.  I

23   joined -- I went to Vietnam just to get away

24   from a bad situation.

25   **PRESIDING COMMISSIONER GARNER:**  So what was

26   the bad situation?  Was it just abuse?

27   **INMATE EVINS:**  We lived in Kansas City.

48

1    Kansas City was worse than Oakland.

2        **PRESIDING COMMISSIONER GARNER:**  What did

3    your father, did he work?

4        **INMATE EVINS:**  He worked.

5        **PRESIDING COMMISSIONER GARNER:**  Okay.

6        **INMATE EVINS:**  He had two families.  You

7    know, he had another family.  I had other

8    brothers and sisters.

9        **PRESIDING COMMISSIONER GARNER:**  Okay.  So

10   you had a stepmother and stepsister and

11   brothers?

12       **INMATE EVINS:**  Yes.

13       **PRESIDING COMMISSIONER GARNER:**  Were you

14   the oldest?

15       **INMATE EVINS:**  No.  I had two sisters --

16   stepsisters older than myself.

17       **PRESIDING COMMISSIONER GARNER:**  Other than

18   not being in an intimate relationship with your

19   father, close to your father, were you ever

20   abused?

21       **INMATE EVINS:**  You mean --

22       **PRESIDING COMMISSIONER GARNER:**  Were you

23   abused?

24       **INMATE EVINS:**  Abused how?

25       **PRESIDING COMMISSIONER GARNER:**  Child

26   abuse?

27       **INMATE EVINS:**  Oh yeah, without a doubt,

1  yes.  I was hit with everything that wasn't

2  bolted down.

3      **PRESIDING COMMISSIONER GARNER:**  Okay.  Were

4  you doing drugs at that time?

5      **INMATE EVINS:**  No.

6      **PRESIDING COMMISSIONER GARNER:**  No.

7      **INMATE EVINS:**  I didn't start using drugs

8  until I went to Vietnam.

9      **PRESIDING COMMISSIONER GARNER:**  And your

10  father died while you were in Vietnam?

11      **INMATE EVINS:**  He died shortly after I got

12  out of the service.

13      **PRESIDING COMMISSIONER GARNER:**  Okay.  And

14  you dropped out of high school?

15      **INMATE EVINS:**  Yes, the 11th grade.

16      **PRESIDING COMMISSIONER GARNER:**  You joined

17  the Job Corp?

18      **INMATE EVINS:**  Yes.

19      **PRESIDING COMMISSIONER GARNER:**  Stayed in

20  the Job Corp for a year and a half, got your GED

21  and a high school diploma in '88?

22      **INMATE EVINS:**  Yes.

23      **PRESIDING COMMISSIONER GARNER:**  Entered the

24  service, the army, in '69, did tours of duty in

25  Vietnam?

26      **INMATE EVINS:**  19 months in Germany.

27      **PRESIDING COMMISSIONER GARNER:**  And went to

50

1  Germany, later discharged as a combat engineer,

2  graded E3 in '72?

3      INMATE EVINS:  Yes.

4      PRESIDING COMMISSIONER GARNER:  And you

5  were involved in some fire fights there?

6      INMATE EVINS:  Yes.

7      PRESIDING COMMISSIONER GARNER:  Were you

8  ever hit, shot yourself?

9      INMATE EVINS:  I had fragmentation in my

10  leg.

11      PRESIDING COMMISSIONER GARNER:  From

12  bullets or --

13      INMATE EVINS:  Fragmentations.

14      PRESIDING COMMISSIONER GARNER:  Frags?

15      INMATE EVINS:  Right.

16      PRESIDING COMMISSIONER GARNER:  Is that

17  some of the same difficulty that you're having

18  now?

19      INMATE EVINS:  Yes, sir.

20      PRESIDING COMMISSIONER GARNER:  And you

21  denied any drug use at a teenager; however, at

22  Vietnam you began to use marijuana?

23      INMATE EVINS:  Can I ask you a question?

24      PRESIDING COMMISSIONER GARNER:  We need to

25  change the tape.

26      DEPUTY COMMISSIONER RICHARDSON:  Back on

27  record.

51

1      **PRESIDING COMMISSIONER GARNER:**  Okay.  I'll

2    start over, and that was that you denied any

3    drugs as a teenager; however, in Vietnam you

4    began using marijuana and hashish while Germany

5    and later on you started using and selling

6    cocaine?

7      **INMATE EVINS:**  Not in Germany.  They had no

8    (indiscernible) there in Germany.  I wasn't

9    selling drugs in Germany.  That's where I used

10   the hashish while I was in Germany.

11      **PRESIDING COMMISSIONER GARNER:**  I'll read

12   it verbatim and then you can certainly correct

13   it for me.  It says "in Vietnam you began using

14   marijuana and used some hashish while he was in

15   Germany and later on started using and selling

16   cocaine."

17      **INMATE EVINS:**  Once I was out of the

18   service.

19      **PRESIDING COMMISSIONER GARNER:**  Okay.  I

20   understand.  And you were married at the time of

21   this offense?

22      **INMATE EVINS:**  Yes.

23      **PRESIDING COMMISSIONER GARNER:**  And you

24   married Patty McAllister, M-C-A-L-L-I-S-T-E-R.

25      **INMATE EVINS:**  Her name was Hattie.

26      **PRESIDING COMMISSIONER GARNER:**  Hattie,

27   with an H?

52

1        **INMATE EVINS:**  With an H.

2        **PRESIDING COMMISSIONER GARNER:**  And the so

3    that the record is correct, it's Hatty, H-A-T-T-

4    Y or I-E?

5        **INMATE EVINS:**  H-A-T-T-I-E.

6        **PRESIDING COMMISSIONER GARNER:**  Okay.

7    Hattie, H-A-T-T-I-E, McAllister on October 20th,

8    1983, and you were together for 13 years, and

9    there were three children born from the

10    relationship, ages 19, 17, and 16.  And boys are

11    girls or both?

12        **INMATE EVINS:**  My two oldest are boys.

13        **PRESIDING COMMISSIONER GARNER:**  The two

14    oldest, and the youngest is a girl?  And how are

15    they doing?

16        **INMATE EVINS:**  My sons are struggling.  My

17    daughter has -- all of them has kids.  My

18    daughter has -- she's in Sacramento.  She's a

19    daughter.  I have six grandkids, and my son,

20    like I said, my sons are struggling.

21        **PRESIDING COMMISSIONER GARNER:**  Are they in

22    Oakland?

23        **INMATE EVINS:**  They're in -- one is in

24    Fresno.

25        **PRESIDING COMMISSIONER GARNER:**  Fresno.

26        **INMATE EVINS:**  And one is in Sacramento.

27        **PRESIDING COMMISSIONER GARNER:**  And where

53

1    is your daughter?

2        **INMATE EVINS:**  Sacramento.

3        **PRESIDING COMMISSIONER GARNER:**  Sacramento

4    also.  It looks like you were divorced in '90

5    during your incarceration, and that you've not

6    been employed since 1980 due to the disability,

7    which you received a 20 percent rating

8    disability pay rate from the Veterans

9    administration?

10       **INMATE EVINS:**  Yes.

11       **PRESIDING COMMISSIONER GARNER:**  And you

12   were paying $122 a month, which you augmented

13   with landscaping and handyman type jobs on the

14   side.  Following the Vietnam War, you were

15   involved in VA therapy programs since '77,

16   stated "when I went to Vietnam I was never the

17   same event.  I was disoriented and screwed up."

18   So you came back as the word you used pretty

19   skewed up?

20       **INMATE EVINS:**  Yes.

21       **PRESIDING COMMISSIONER GARNER:**  Okay.  Your

22   parole plans, it says here apparently you've

23   done some solidifying on the parole plans sort

24   of sured them up in some way.  This indicates

25   that you'll be able to secure a residence with

26   your cousin Louis L-O-U-I-S Lennard, L-E-N-N-A-

27   R-D, in San Jose, California?

54

1    **INMATE EVINS:**  Yes, sir.

2    **PRESIDING COMMISSIONER GARNER:**  And the

3    address is on North Third Street?

4    **INMATE EVINS:**  Third street.

5    **PRESIDING COMMISSIONER GARNER:**  Is this a

6    single family home or apartment?

7    **INMATE EVINS:**  This is a single family

8    home?

9    **PRESIDING COMMISSIONER GARNER:**  Okay.  Who

10    else lives there with him?

11    **INMATE EVINS:**  His children are out.  One

12    is going to NYU and his daughter lives in San

13    Francisco.  She is doing advertising, commercial

14    advertising, so just he and his wife.

15    **PRESIDING COMMISSIONER GARNER:**  What does

16    Mr. Lennard do?

17    **INMATE EVINS:**  He's retired.  He worked for

18    the State for several years and now he's retired

19    and he started this vending business and Louis

20    Dogs they call it.  He got this hot dog vending

21    business.

22    **PRESIDING COMMISSIONER GARNER:**  That's the

23    hot dog cart, I think.

24    **INMATE EVINS:**  Yes, and he has a store too.

25    **PRESIDING COMMISSIONER GARNER:**  He has a

26    store?

27    **INMATE EVINS:**  Yes.

55

1      **PRESIDING COMMISSIONER GARNER:**  Does his

2  wife work?

3      **INMATE EVINS:**  Yes, she does.  She

4  explained to me several times.  She works -- it

5  has something to do the Tri-counties around here

6  dealing with hate crimes, hate crimes, and hate

7  crimes or something, but she runs the thing

8  dealing with hate crimes or something, some

9  organization around here.

10      **PRESIDING COMMISSIONER GARNER:**  And as far

11  as the employment they were apparently jobs

12  mentioned in previous hearings, and there were

13  additional opportunities in graphic art and data

14  processing?

15      **INMATE EVINS:**  Yes, sir.

16      **PRESIDING COMMISSIONER GARNER:**  Okay.

17      **ATTORNEY CHRISTENSEN:**  Are there any

18  possible benefits you could apply for at the

19  Vet?

20      **INMATE EVINS:**  Yes, I started -- I've

21  started a Veteran's group since I've been here

22  at Soledad.  It took me about five or six years,

23  myself and another Inmate Wilson, and we -- this

24  was off the ground.  We have this guy named

25  Garza from the Veteran's group -- from the

26  Veteran's administration right down here that

27  comes in to visit us regularly, and he helps

56

1   other guys get their Veteran's benefits started.

2   And mine are ongoing, and I'll be -- I'll

3   probably -- I'm not sure what my rating will be

4   when I get out of here, but it will be much -- I

5   progressively gotten worse dealing with the

6   physical disability, and so I'll probably get

7   like 40, 50, 60 percent disability from that.

8       **ATTORNEY CHRISTENSEN:**  Do you have any idea

9   what that will translate dollars?

10      **INMATE EVINS:**  Probably about a thousand --

11  I think it's a thousand, 1500 or a thousand.

12      **ATTORNEY CHRISTENSEN:**  Very good.

13      **PRESIDING COMMISSIONER GARNER:**  Okay.

14  Thank you.  At this time what I want to do is

15  read the letters of support that we have.  And

16  the first one is from your cousin, Louis

17  Lennard.  It's a typed letter, and I don't see a

18  date on it.  And it's to reaffirm the support

19  for you and that he's attended your hearing

20  before the Board in Sacramento.  He and his wife

21  want to help you reestablish yourself in the

22  community, provide you with a job and help that

23  his words had fallen on deaf ears.  He was a

24  little depressed when he walked back to his

25  seat, and essentially he just made some comments

26  about his feelings concerning the hearing.  And

27  that you earned the opportunity to be granted a

57

1  parole, and sort of certainly what you have here

2  is an offer of employment and also this is where

3  you would live?

4      **INMATE EVINS:**  Yes.  There should be a

5  couple letters in there from him.

6      **PRESIDING COMMISSIONER GARNER:**  Okay.  The

7  next one is dated September 4, 2004, it's a

8  handwritten letter.

9      **INMATE EVINS:**  I think that one is from my

10  son.

11     **PRESIDING COMMISSIONER GARNER:**  It looks

12  like it.  I have three pages -- do you have

13  another page, Counselor?

14     **ATTORNEY CHRISTENSEN:**  I am seeing three --

15  it does end abruptly on page three.  Do you have

16  the original of that?

17     **INMATE EVINS:**  I don't know which letter

18  that it is.

19     **ATTORNEY CHRISTENSEN:**  It abruptly ends at

20  page three.  Can you find a page four somewhere?

21     **INMATE EVINS:**  That was my son.  I don't

22  have that particular letter, no.

23     **PRESIDING COMMISSIONER GARNER:**  Okay.  He

24  identifies himself as your son, speaks to an

25  older brother and younger sister.

26     **INMATE EVINS:**  I have the letter -- no, I

27  don't have it with me, but I figured -- I don't

58

1   know why it would only be one page there.

2       **PRESIDING COMMISSIONER GARNER:**  It's three,

3   but we're missing one, I think the signature

4   page, I think.  It speaks to being 22 years old

5   and having a small family of his own.  He has a

6   17 month old.  This is last year.  It speaks to

7   you now being a grandmother and would love to

8   have his children getting to know you.  It

9   speaks to the period of time of you being

10  incarcerated, starting a new life to accomplish

11  his goals with all of the different skills that

12  you've learned.  Everyone deserves a second

13  chance.  It speaks to family support.  That

14  there would be no need for a third chance.  He's

15  made a lot of wrong decisions in his life, but

16  that one that sent him to prison for almost a

17  year and now he's got a second chance, and he

18  won't be back.  Asking for a second chance.  So

19  those are the two letters that I have.  Are

20  there any additional letters?

21      **INMATE EVINS:**  My daughter wrote one.

22      **ATTORNEY CHRISTENSEN:**  That's all I have.

23  Did you bring anything else?

24      **INMATE EVINS:**  My daughter wrote one here.

25  Can I read this into the record?

26      **ATTORNEY CHRISTENSEN:**  Oh.  This one, you

27  didn't show me this.

59

1    **INMATE EVINS:**  It should be in the record.

2    **ATTORNEY CHRISTENSEN:**  No, no.

3    **INMATE EVINS:**  It was before.

4    **ATTORNEY CHRISTENSEN:**  Where does this

5    begin because this starts --

6    **INMATE EVINS:**  Right here.

7    **ATTORNEY CHRISTENSEN:**  To whom it may

8    concern?

9    **INMATE EVINS:**  Yes, I added this to a

10    story.  I write a lot of short stories.

11    **ATTORNEY CHRISTENSEN:**  Do you have any

12    other letters of support that I'm not aware of?

13    **INMATE EVINS:**  No.  They should of been in

14    the record.  They've always have been there, so

15    I didn't --

16    **ATTORNEY CHRISTENSEN:**  This one is from

17    2002, so that's not what we would be concerned

18    about.  We're interested in a period of time

19    since your last hearing.

20    **INMATE EVINS:**  Well, my cousin wrote one.

21    I got -- I had the copy of it, and I assume it

22    was -- it was there the last time I came.

23    **ATTORNEY CHRISTENSEN:**  All we have is two.

24    **INMATE EVINS:**  It was there the last time I

25    came.

26    **PRESIDING COMMISSIONER GARNER:**  Well, we --

27    **INMATE EVINS:**  This same package -- I

60

1   received the same package.  I haven't been to

2   the Board since 2003.

3         **PRESIDING COMMISSIONER GARNER:**  Okay.  We

4   checked, but we're satisfied that the pertinent

5   letters that we're interested in are offers of

6   employment and housing for the record.  That

7   seems to be intact, so the other letters, they

8   would be good, but we unfortunately don't have

9   them today.  Okay.  And that's all?

10        **INMATE EVINS:**  I submitted a letter to my

11  counselor, a newspaper article, and that's

12  supposed to -- it didn't seem to find its way in

13  there either.  It was a -- it was out of the San

14  Jose Mercury, a huge article that they wrote

15  concerning my cousin.  It had his picture in

16  there and everything, talking about the business

17  that he was running.  It was like a two-page

18  article, and I don't -- it didn't make it there

19  either.  I have no control other what goes in

20  and out of there.  I get it, but I have no

21  control over it.

22        **PRESIDING COMMISSIONER GARNER:**  We don't

23  either, sir.

24        **INMATE EVINS:**  Yeah.

25        **ATTORNEY CHRISTENSEN:**  As part of your

26  parole plans, did you submit anything to your

27  counselor as verification from a 12 step group

61

1   that you would attend if you were to be paroled?

2       **INMATE EVINS:**  Yes, it's all in there, yes.

3   Every time I come to the Board they ordered this

4   as part of the parole plans to continue with

5   this and continue with that.

6       **ATTORNEY CHRISTENSEN:**  You need to make

7   copies of everything before you give anything to

8   your counselor because --

9       **INMATE EVINS:**  It goes to her first.  It

10  don't come to me.  It goes to the counselor

11  first.  They give me copies.

12      **ATTORNEY CHRISTENSEN:**  How would -- oh.

13  Never mind.

14      **PRESIDING COMMISSIONER GARNER:**  Okay.  Sir,

15  we did send out 3042 notices, if you know, those

16  are the legal notices that go to the agencies

17  that were involved in the investigation,

18  apprehension, prosecution, and the defense that

19  was provided to you, and in response to those

20  notices we do have a representative from the

21  Fresno County District Attorney who will be

22  speaking later in the hearing.  And at this time

23  I'm going to turn the hearing to Commissioner

24  Richardson, and if you'd direct your attention

25  to her please.

26      **DEPUTY COMMISSIONER RICHARDSON:**  Good

27  afternoon.

1        **INMATE EVINS:**  Good afternoon.

2        **DEPUTY COMMISSIONER RICHARDSON:**

3   Essentially what I'm going to be doing is trying

4   to get an update, although I'm going to give

5   some historical information.  This will be an

6   update from the last hearing in September of

7   2003.  And I think at that time you were -- were

8   you actually already starting that BRAG Group

9   then?

10       **INMATE EVINS:**  Yes, it was in the process,

11  now it's up and going.

12       **DEPUTY COMMISSIONER RICHARDSON:**  Okay.

13  Balance --

14       **INMATE EVINS:**  Balance Reentry Group.

15       **DEPUTY COMMISSIONER RICHARDSON:**  Okay.  And

16  what do you guys do in that?

17       **INMATE EVINS:**  Well, it's to help people in

18  and outside of prison who are on parole.  It's

19  to help them with resources.  At the last group

20  we had took addresses of every place that we

21  could think of and put them on slips of paper

22  and everybody selected one.  You had to write

23  these places because we sent out, like myself, I

24  have written place in Fresno.  All my letters

25  come back saying these places don't -- they're

26  not available.

27       **DEPUTY COMMISSIONER RICHARDSON:**  You should

63

1  always keep those.

2       **INMATE EVINS:**  I turn them in before.

3       **DEPUTY COMMISSIONER RICHARDSON:**  No, no,

4  no.  You should keep them in your own folder.

5       **INMATE EVINS:**  The letter that are no good?

6       **DEPUTY COMMISSIONER RICHARDSON:**  Yeah.

7       **INMATE EVINS:**  Okay.  But anyway, but in

8  the BRAG.

9       **DEPUTY COMMISSIONER RICHARDSON:**  I mean,

10  you should make that a part -- a part of this

11  group here.  It's always important to -- and I'm

12  not talking about like the chrono.  It's always

13  important to keep all of those because it shows

14  the Board that you wrote 60 letters, or you

15  know, you got a responses back from 25 different

16  places.  Either they're nonexistent anymore or

17  they're sorry, we don't have anything or that

18  type of stuff.  But it's always a good idea to -

19  - that might be good for your group.

20       **INMATE EVINS:**  Well, this is part of what

21  we do, and we're just trying to help these --

22  the people that are leaving here.  We are trying

23  to help them with resources, and it's kind of

24  hard, you know, after being down for a certain

25  amount of time to gauge what exactly it is you

26  need to be leaving here with, so we're trying to

27  put stuff like that together, you know, putting

64

1    packages of information together.

2        **DEPUTY COMMISSIONER RICHARDSON:**  You know

3    what they do at CIW?

4        **INMATE EVINS:**  No.

5        **DEPUTY COMMISSIONER RICHARDSON:**  They

6    actually do mock hearings.

7        **INMATE EVINS:**  I've thought about that.

8    I've thought about that.

9        **DEPUTY COMMISSIONER RICHARDSON:**  They put

10   them in the hot seat.

11       **INMATE EVINS:**  That's a good -- I think

12   they did that at Solano.  That's a good idea.

13       **DEPUTY COMMISSIONER RICHARDSON:**  Yeah.  But

14   that's more of a lifers.  It looks like this is

15   kind of a combination thing.  One of the things

16   that you may want to do, is you may want to try

17   the EDD groups.  They now have offices linked

18   with all of the parole offices.

19       **INMATE EVINS:**  Right.  Right.

20       **DEPUTY COMMISSIONER RICHARDSON:**  It may be

21   a good idea to tap into some of those in some of

22   the major cities and try to draw resources from

23   them.  They're also now new co-op.  Some of the

24   institutions have the -- there's an electrician

25   co-op system where if you have a vocation in

26   this particular area, there's incentives through

27   EDD to hire you and give you job offers.  I've

65

1  actually seen lifers get job offers from that,

2  so that might be something else that you guys

3  might want to tap into.  I don't know if you

4  want to deal with the parole administrators, but

5  that's kind of the higher level, so there are

6  parole administrators over a number of different

7  offices, and that's something that you may be

8  able to start drawing, you know, some options --

9      **INMATE EVINS:**  Yes, thank you.

10      **DEPUTY COMMISSIONER RICHARDSON:**  --

11  available, but that's a really good thing.

12  There's multiple chronos in here that you've

13  continued with a lot of the self-help groups,

14  and you're right, this one appears to be up and

15  running.  Now, it's almost like your art.  The

16  sky is the limit when you're starting to begin

17  something like that as far as zeroing in on it.

18  You continued with your NA and AA, and I noted

19  that for the record.  Your counselor has

20  indicated in his updated report that -- this is

21  CC1 Verdesotl.

22      **INMATE EVINS:**  Verdesotl.

23      **DEPUTY COMMISSIONER RICHARDSON:**  Verdesotl,

24  V-E-R-D-E-S-O-T-L, and he's indicated that you -

25  -

26      **INMATE EVINS:**  She.

27      **DEPUTY COMMISSIONER RICHARDSON:**  Oh, I'm

66

1   sorry, she indicated that you finished a six-

2   week course in writing the personal essay.

3      **INMATE EVINS:**  Yes.

4      **DEPUTY COMMISSIONER RICHARDSON:**  And in

5   addition to that, you participated in creative

6   writing class entitled Writing From Personal

7   Experience, and I think you actually mentioned

8   that.

9      **INMATE EVINS:**  Yes, I have some short

10  stories.

11     **DEPUTY COMMISSIONER RICHARDSON:**  I noted

12  somewhere, oh, here it is, you're registered for

13  college courses.  Now, that's Coastline?

14     **INMATE EVINS:**  Yes, Coastline.

15     **DEPUTY COMMISSIONER RICHARDSON:**  What are

16  you taking there?

17     **INMATE EVINS:**  Well, I ran into a snag, and

18  I have that here.  I just got a thing back from

19  one of the teachers here, and I just ran into a

20  serious snag where I was not so dropped but,

21  well, dropped as of 10/20 because they said that

22  at another time I was going -- I finished

23  classes here, and for some reason they said they

24  didn't get the registration.  I have my

25  receipts, and I haven't written them, and I

26  haven't had a chance to straighten it out yet.

27  She written me back because I wrote her

1  concerning why my grades --

2      **DEPUTY COMMISSIONER RICHARDSON:**  Okay.  Not

3  enrolled because you owed fees from a previous

4  semester.

5      **INMATE EVINS:**  Yeah, well, I have all -- as

6  a matter of fact, I brought all of that.  And

7  according to the admission records Coastline,

8  this is the letter that I wrote her, but I did

9  pay them and there are lot of guys here that

10  have been having that same problem.  When you

11  have -- I guess, if I had sent out my book, I

12  would of had more direct contact with them, but

13  my aunt, the same one that I talked about out of

14  Vallejo, she's always have -- when I have

15  something like that needs to be done, she takes

16  care of it immediately.  And even if -- back in

17  2003 they saying that they didn't receive that

18  money.  This money for these classes right here.

19  I was taking biology and an art class, and they

20  received that money, but they saying I'm not

21  registered because of the money in 2003, which

22  I've already got grades for.

23      **DEPUTY COMMISSIONER RICHARDSON:**  Well, it

24  says here that you were enrolled in both courses

25  aforementioned, I'm not sure, biology and art.

26      **INMATE EVINS:**  Uh-huh.

27      **DEPUTY COMMISSIONER RICHARDSON:**  Since Mr.

68

1   Evins had no idea he was enrolled, he didn't

2   complete any assignments or exams.  He's asking

3   now to be dropped without penalty since it

4   wasn't his fault.

5        **INMATE EVINS:**  Uh-huh.  They said that they

6   didn't the registration.

7        **DEPUTY COMMISSIONER RICHARDSON:**  Yeah, but

8   they're saying here that they went ahead and let

9   you in the class but you never did any

10  assignments.

11       **INMATE EVINS:**  I did -- I couldn't get the

12  -- there are certain, like the particular art

13  class.  It was just -- I couldn't get these

14  particular type of -- the one was the ink in

15  here because of the tattooing, and I don't do

16  any tattooing, but they wouldn't let us get

17  that.  I couldn't get the materials that went

18  with that particular class.

19       **DEPUTY COMMISSIONER RICHARDSON:**  Okay.

20  This is weird.

21       **INMATE EVINS:**  She's the coordinator

22  between us and the school, Ms. Barns.

23       **DEPUTY COMMISSIONER RICHARDSON:**  All right.

24  So this verification is that they have a case of

25  $66 outstanding debt from spring 2003, so you

26  weren't in it.

27       **INMATE EVINS:**  I was in it.  I got the

69

1  grades.  I got the grades.  I finished it.  I

2  got the grades, but they're saying now --

3      **DEPUTY COMMISSIONER RICHARDSON:**  For art

4  and biology?

5      **INMATE EVINS:**  No, no.  This is for --

6      **DEPUTY COMMISSIONER RICHARDSON:**  2000 --

7      **INMATE EVINS:**  Right, this was for

8  counseling and --

9      **DEPUTY COMMISSIONER RICHARDSON:**  Right.

10  But I guess the thing is that this verifies that

11  you should of been doing any assignments on

12  these two classes because you weren't actually

13  enrolled because of the old debt.

14      **INMATE EVINS:**  Right.  See, I knew nothing

15  about the old debt until I --

16      **DEPUTY COMMISSIONER RICHARDSON:**  Until

17  this.

18      **INMATE EVINS:**  Until this happened, right.

19      **DEPUTY COMMISSIONER RICHARDSON:**  Okay.

20      **INMATE EVINS:**  But it's just kind of

21  confusion, but you know, I'm here at a place

22  where I can't reach out and take care of this

23  stuff the way --

24      **DEPUTY COMMISSIONER RICHARDSON:**  I don't

25  know that it would really matter where you are

26  sometimes when you're dealing with

27  bureaucracies.

1       INMATE EVINS:   I agree.

2       DEPUTY COMMISSIONER RICHARDSON:   But --

3    okay.  So what you're -- at this point what

4    you're doing is trying to resolve the $66.

5       INMATE EVINS:   Yes.

6       DEPUTY COMMISSIONER RICHARDSON:   And then

7    you're be back on track.

8       INMATE EVINS:   Because it was paid.

9       DEPUTY COMMISSIONER RICHARDSON:   So what is

10    your ultimate goal with this?

11       INMATE EVINS:   I was trying to get to --

12    I'm so many units from getting my AA.

13       DEPUTY COMMISSIONER RICHARDSON:   How many?

14       INMATE EVINS:   Probably less than 15 or 20

15    because I was went to college -- I was going to

16    Lanny (phonetic) College and I went to Lanny,

17    Alameda, and Merit College in Oakland.  I did

18    immediately after coming out of the school.  I

19    took mostly psychology courses, human behavior,

20    lifestyle, interpersonal relationships.  I did

21    that on the street before all of this -- before

22    all of this street stuff started happening is

23    when I was going to school.  I was so confused.

24    I took mostly psychology trying to figure me

25    out, and it didn't work.

26       DEPUTY COMMISSIONER RICHARDSON:   Here you

27    go.  Okay.  So you're going to be back on track

1  with that?

2    **INMATE EVINS:**  Yes.

3    **DEPUTY COMMISSIONER RICHARDSON:**  And then

4  your ultimate goal is to get the AA?

5    **INMATE EVINS:**  Well, I want to even get

6  past the AA, but that was right now.  That is

7  what I was reaching for here, but I want to

8  continue.  I want to be a counselor.  I want to

9  become a counselor myself.

10    **DEPUTY COMMISSIONER RICHARDSON:**  Okay.

11  That would be good.

12    **INMATE EVINS:**  Drug counselor.

13    **DEPUTY COMMISSIONER RICHARDSON:**  So how

14  long have you been involved with NA/AA?

15    **INMATE EVINS:**  Several years.

16    **DEPUTY COMMISSIONER RICHARDSON:**  Huh?

17    **INMATE EVINS:**  Several years.

18    **DEPUTY COMMISSIONER RICHARDSON:**  Several

19  years, what step are you working?

20    **INMATE EVINS:**  I've written on each one of

21  them over time.  I go in there now and I just

22  mainly, mainly go in there and talk about

23  experiences.

24    **DEPUTY COMMISSIONER RICHARDSON:**  Can you

25  describe step eight for me?

26    **INMATE EVINS:**  Not offhand.

27    **DEPUTY COMMISSIONER RICHARDSON:**  How about

72

1   a relapse prevention plan?

2       **INMATE EVINS:**  I had -- I intend not to

3   ever mess with drugs.

4       **DEPUTY COMMISSIONER RICHARDSON:**  Well,

5   having done revocation hearings for many, many

6   years, I can tell you that every single parolee

7   on his release date will tell you the exact same

8   thing, and when they relapse and they're in my

9   revocation they will tell you -- but the relapse

10  prevention plan is a means to get there because

11  the actual meaning and intentions don't always

12  work.

13      **INMATE EVINS:**  I understand.

14      **DEPUTY COMMISSIONER RICHARDSON:**  So --

15      **INMATE EVINS:**  I understand.  I'm 57.  I

16  just turned 57 last month, and I have no

17  intention of repeating anything in my past.

18      **DEPUTY COMMISSIONER RICHARDSON:**  I've put

19  guys back in that are over 65.

20      **ATTORNEY CHRISTENSEN:**  What is your relapse

21  prevention plan?  Specifically, what will you do

22  if paroled to prevent yourself from returning to

23  drug abuse?

24      **INMATE EVINS:**  I plan on surrounding myself

25  with my grandkids, my children, my grandkids,

26  and going through the Veteran's Administration.

27  I plan on dealing with them and then going to

73

1    programs on the street too.

2         **ATTORNEY CHRISTENSEN:** Will you continue

3    with NA?

4         **INMATE EVINS:** Yes, ma'am, without the

5    doubt. Yes, ma'am. That always been part of

6    the requirements of my parole. Every parole

7    that I've finished, even when I was found

8    suitable in 2003 Ms. Lawland and Vernato

9    (phonetic), and that was part of the plan. Like

10   I said then, I have no intentions -- I mean,

11   like you said, I know anything can happen, but

12   I've been even here, you know, I don't have any

13   intentions of repeating anything from any past,

14   including people, and I've been fortunate so

15   far. I didn't know anybody in Fresno. I moved

16   down there because my wife had people down there

17   from the Bay Area, and I moved down there then

18   to get away from the madness that I was going

19   through in the Bay Area. I moved to Fresno to

20   get away from that and the same people, all my

21   friends from Oakland came to Fresno because it

22   was easy living and I did really good down there

23   in Fresno for a long time until all the problems

24   just kind of came back to me. Now, my hopes are

25   with going to San Jose, and I know nobody down

26   there, but other than my family. This is my

27   first cousin, my aunt, it mentioned her in there

74

1  several times too.  This is her son.  This is my
2  first cousin, and she's very supportive, my aunt
3  is, she's in her 80s now, and I pray that I get
4  out of here before she passes because her health
5  is getting worse too, but I don't know anybody
6  down there and this is a brand new start for me.
7  Even dealing with the art, I did -- I talked to
8  them maybe two weeks ago and she -- my cousin's
9  wife, she did a show of my stuff.  She has about
10  over a hundred pieces of mine and they put all
11  of this stuff and people was amazed, and so she
12  said start doing more (indiscernible) because I
13  was putting variation on other people's work and
14  changing the color and this and that, and they
15  were going to help me, even with this.  I can --
16  you know, I can do that business with him, and
17  I'm excited about doing that because, like I
18  said, I'm going to a place that I never lived
19  before, meeting brand new people and -- but the
20  art work and my main job, as I keep saying at
21  every hearing, is to try to put my family back
22  together because my family is just as
23  dysfunctional now as I was when I came to
24  prison, and trying to go out there and trying to
25  help some of these grandsons.  I have four
26  grandson and two granddaughters and trying to
27  help these kids because my kids are off the

75

1   Richter scale with the things they're doing, you

2   know, and I'm directly responsible for that.

3   It's my fault that they are the way that they

4   are.  You know, I mean, anybody here can tell

5   you the same thing about their family too, but

6   it's mine that I'm concerned about.  It used to

7   be try to change the world, now I'm just trying

8   to save me and my family.

9       **DEPUTY COMMISSIONER RICHARDSON:**  All right.

10  I'm just beginning the verify the vocation that

11  you've completed including data processing,

12  business applications, information technology,

13  integrated business administration, and then as

14  we've discussed courses in -- prior to

15  incarceration, since incarceration, continued

16  courses with Coastline Community College towards

17  an AA.  Yes?

18      **INMATE EVINS:**  Yes.

19      **DEPUTY COMMISSIONER RICHARDSON:**  Any other

20  vocations?

21      **INMATE EVINS:**  I did -- when I first got

22  here I was in electricity.  I took -- I was in

23  the electric shop, but I already knew about

24  that.  I took heating, air-conditioning, and

25  refrigeration.  I graduated within the top 10 of

26  my class when I was in the Job Corp.  I never

27  made a dime or made a dime out in it because I

1   went straight out of there into the service.

2       **DEPUTY COMMISSIONER RICHARDSON:**  And that

3   was in 1967 when you were in there?

4       **INMATE EVINS:**  I can build a system from

5   the compressor all through the system back to --

6   I was really good at that.  Like  I said, I

7   graduated in the top 10 of that class, but I

8   never made any money, and so I -- in that

9   particular class right there taught me a lot of

10  stuff in electronics, schematics, loop

11  (indiscernible) rating and -- it's a lot of

12  trades in that one trade.

13      **DEPUTY COMMISSIONER RICHARDSON:**  Did you

14  get an electrician vocation in the institution?

15      **INMATE EVINS:**  Here?

16      **DEPUTY COMMISSIONER RICHARDSON:**  Here.

17      **INMATE EVINS:**  Yes, I worked here in

18  Soledad.

19      **DEPUTY COMMISSIONER RICHARDSON:**  Did you

20  get a certificate?

21      **INMATE EVINS:**  No, this was a job.  This

22  was just a regular job.

23      **DEPUTY COMMISSIONER RICHARDSON:**  Okay.

24      **INMATE EVINS:**  Because of the experience I

25  had in air-conditioning and electricity.

26      **DEPUTY COMMISSIONER RICHARDSON:**  So you

27  haven't gotten an actual --

77

1    **INMATE EVINS:**  No.  I took drafting here,

2  not here, I took drafting when I was at CMC, and

3  I -- so I went -- I was in -- I took maybe six

4  months of electronics when I was up there then I

5  got transferred here.

6    **DEPUTY COMMISSIONER RICHARDSON:**  Okay.

7    **INMATE EVINS:**  I've been in several other

8  trades but none that I finished here.

9    **DEPUTY COMMISSIONER RICHARDSON:**  So the

10  ones I listed are the ones you finished.  Okay.

11  Now, you're working on the yard crew?

12    **INMATE EVINS:**  I'm working on the yard

13  crew.

14    **DEPUTY COMMISSIONER RICHARDSON:**  Continuing

15  with the Veteran's Support Group?

16    **INMATE EVINS:**  Yes.

17    **DEPUTY COMMISSIONER RICHARDSON:**  Hepatitis

18  C Support Group?

19    **INMATE EVINS:**  Yes.

20    **DEPUTY COMMISSIONER RICHARDSON:**  All right.

21  There was a psychiatric report.  This is by Jeff

22  Howlin, H-O-W-L-I-N.  The doctor notes the

23  inmate has excellent insight into his past and

24  is very convincing in his talk about remaining

25  sober and staying sober if paroled.  As I

26  concluded in my October of 2004 report, my

27  opinion is similar to that of Dr. MacComber's

78

1    opinion.  There is no need to continue referring

2    this inmate back for further psychological

3    evaluation.  Psychological factors should not be

4    a consideration in decisions to parole this

5    inmate.  There's no need for further evaluation.

6    There's no recommendation for further therapy to

7    address his commitment offense or insight into

8    his past.  It's recommended that he continue

9    with his excellent record in CDC.  And just for

10   the record, there was a review of the Governor's

11   letter.  I don't believe that self-help was a

12   real issue by the Governor's office.  Commitment

13   offense, and you had indicated here that there

14   were just a lot of different versions of the

15   incident out there on the street and you had

16   explained to the doctor further that this was

17   considered your days of madness.  There was

18   depictions with many different versions of what

19   specifically happened by different individuals.

20   And he did admit at the time that his story was

21   not the truth of the matter, so I think you've

22   kind of reiterated that here today, but I just

23   was wondering what days of madness are you just

24   talking about?  Coming to grips with the actual

25   commitment itself over time that just kind of

26   evolved to the point where there's an

27   acknowledgment?

1    **INMATE EVINS:**  Yes, I was just living, just

2    going through all the stuff I was going through

3    the way I was living, even though I was married

4.   and had three kids.  And I still didn't know how

5    to function, you would say as a man, I guess.

6    As a male I did, but as a man, in many way, I

7    didn't.

8    **DEPUTY COMMISSIONER RICHARDSON:**  Okay.

9    With regards to that, there's in the 2003

10   report, and this is referenced in the Governor's

11   letter, and I just want to make sure that I have

12   it clear.  On page three of that report, push

13   the door open, the victim woke up and began

14   arguing with the inmate.  This argument

15   escalated, the inmate shot and killed the victim

16   with a gunshot wound to the chest.  Is that an

17   accurate depiction of the incident?

18   **INMATE EVINS:**  Well, like I said, it all

19   took place in less than three to four minutes,

20   and so there wasn't a lot of argument.  And he

21   asked -- when it was done, I asked him was he

22   shot.  He said, why did you shoot me.  I asked

23   was he shot because it was a surprise.  Like I

24   said, it was a surprise to me that I had

25   actually hit him too because I don't want to

26   make this sound liking an accident or if I have

27   in the past because I went there with a gun, but

1    I didn't know that he was shot because I didn't

2    aim the gun at him, you know.

3        **DEPUTY COMMISSIONER RICHARDSON:** Okay. Did

4    you argue and it escalated?

5        **INMATE EVINS:** No.

6        **DEPUTY COMMISSIONER RICHARDSON:** So this --

7        **INMATE EVINS:** I don't think because we

8    wasn't there that long. We wasn't there -- it

9    was very brief. It wasn't an argument because

10   there wasn't really nothing to argue about.

11       **DEPUTY COMMISSIONER RICHARDSON:** Okay. The

12   reason why is because the Governor's letter has

13   indicated that, at least at the time, that this

14   was written they were relied upon the 2003

15   report and actually relied upon that actual

16   statement as a realization and insight that you

17   had to the commitment offense, and the only

18   problem the Governor's office had with it is

19   that it was so recent, meaning that prior to

20   that 2003, there wasn't a full admission and

21   responsibility to the crime. So are you saying

22   here today that this is actually not what

23   happened and it was an accident?

24       **INMATE EVINS:** No. No. No, please I don't

25   want to go back to that. I said it was -- I

26   just said that I went there with a gun, so that

27   made it not -- because I had the gun out, so it

81

1    wasn't an accident, I didn't know him.

2        **DEPUTY COMMISSIONER RICHARDSON:**    Okay.

3        **INMATE EVINS:**    I was looking for somebody

4    else.

5        **DEPUTY COMMISSIONER RICHARDSON:**    What I am

6    trying to say is, according to the psychiatric

7    report in 2003, the victim woke up, you guys

8    argued, the argument escalated, and you shot

9    him?

10        **INMATE EVINS:**    Me and Marcy were talking.

11    He wasn't talking.    The victim wasn't talking.

12    It was me and Marcy that was talking.    Me and

13    this guy wasn't arguing.    It was me and the

14    female that was there that was talking.

15        **DEPUTY COMMISSIONER RICHARDSON:**    Okay.

16    Because this expressly indicates that the victim

17    woke up and began arguing with the inmate, the

18    argument escalated, the inmate shot and killed

19    the victim.    That's not accurate?

20        **INMATE EVINS:**    I explained where I was --

21    where I explained it 20 minutes ago is that

22    exactly pretty much what was said.    It was her

23    that I woke up, and this guy when he jumped up,

24    he didn't really say anything.    He didn't say

25    anything until he was shot.    He said nothing.

26    She and I had said nothing until he was shot,

27    and I asked him -- and he said why did you shoot

82

1   me.  And that's when I knew he was actually hit.
2   And like I said, this was a drug house.  I was
3   going -- I was in psychosis.  I'm not trying to
4   minimize it, but I have a hard time trying to
5   relay this.  I've had years.  I've have had
6   Board members saying you need more time to go
7   back and think about it, and it's kind of hard
8   to go back and think about something that was a
9   haze, you know, I admitted to what I did.  I
10  admitted to this as an avid dope fiend.  The
11  average guy that's out there on the acid or
12  whatever kind of delusions that you're going
13  through at that particular time, and it's hard.
14  You're not going to -- it's hard going to lay
15  out word for word, I was there.  I did this, and
16  I admit to the fact that I did this, but I don't
17  know exactly every word that was said.  And it
18  happened in '86, and I guess maybe I was should,
19  but I was in a drug stupor.  I was going through
20  psychosis.  I was -- I guess you would say
21  tripping, so I don't remember every word that
22  was said, but even if you went to the word, if
23  you went through the police report and read
24  everybody's statement, Andrea Buckner made a
25  statement, Patricia Wise made a statement, Marcy
26  Johnson made a statement, and they all are
27  different.

83

1    **DEPUTY COMMISSIONER RICHARDSON:**    I

2    understand that, but -- okay.  We're just trying

3    to find a line of consistency.

4    **INMATE EVINS:**  He and I didn't argue.  It

5    was me and her.  She was the one that I woke up.

6    **DEPUTY COMMISSIONER RICHARDSON:**  All right.

7    I'm going to go head and return it to the Chair.

8    **PRESIDING COMMISSIONER GARNER:**  Let me ask

9    you a couple follow-up questions.  On the first

10   incident where the guy was strangling your

11   girlfriend or had his hands on your girlfriend

12   or you got into a wrestling match, I think you

13   described it.  While you were wrestling he

14   produced a gun?

15   **INMATE EVINS:**  No.  He went for the gun.

16   **PRESIDING COMMISSIONER GARNER:**  He went for

17   the gun, which was in --

18   **INMATE EVINS:**  In his pocket.

19   **PRESIDING COMMISSIONER GARNER:**  In his

20   pocket.  You got to the gun before he did?

21   **INMATE EVINS:**  We was -- now he and I was

22   arguing.  He and I had got into it because he

23   had did this to -- you know, what he had did to

24   her.  He had fingerprints literally on her neck.

25   **PRESIDING COMMISSIONER GARNER:**  Okay.  Did

26   both of you have your hands on the gun at the

27   same time?

84

1    INMATE EVINS:  Yes.

2    PRESIDING COMMISSIONER GARNER:  Did the gun

3  go off at that time, or did you have possession

4  of the gun?

5    INMATE EVINS:  We was wrestling on the

6  ground --

7    PRESIDING COMMISSIONER GARNER:  So you

8  didn't have sole possession of the gun?

9    INMATE EVINS:  No.

10    PRESIDING COMMISSIONER GARNER:  Okay.  So

11  the gun --

12    INMATE EVINS:  I ended up with it, yes.  I

13  ended up with it.

14    PRESIDING COMMISSIONER GARNER:  Okay.  Let

15  me see if I can rephrase the question.  You're

16  struggling, he makes a reaching motion toward a

17  pocket.

18    INMATE EVINS:  Yes.

19    PRESIDING COMMISSIONER GARNER:  And you

20  suspected that --

21    INMATE EVINS:  I'll kill you.  That kind of

22  stuff.

23    PRESIDING COMMISSIONER GARNER:  Okay.

24    INMATE EVINS:  And I knew he was serious.

25    PRESIDING COMMISSIONER GARNER:  Okay.  You

26  then go for the gun?

27    INMATE EVINS:  Yes, I went for his hand.

85

1      **PRESIDING COMMISSIONER GARNER:**  His hand?

2      **INMATE EVINS:**  Yes.

3      **PRESIDING COMMISSIONER GARNER:**  Were you

4   able to get the gun free from his hand?

5      **INMATE EVINS:**  Yes, after we was wrestling

6   around.  We were wrestling and hitting each

7   other.  We both had hold of the gun.

8      **PRESIDING COMMISSIONER GARNER:**  Okay.  You

9   now have sole possession of the gun at some

10  point in time?

11     **INMATE EVINS:**  Yes.

12     **PRESIDING COMMISSIONER GARNER:**  Are you

13  still on the ground, or did you stand up?

14     **INMATE EVINS:**  I'm standing up.

15     **PRESIDING COMMISSIONER GARNER:**  Okay.  And

16  when did you shoot him?

17     **INMATE EVINS:**  He got shot while we was

18  going for the gun, and plus when I stood up, I

19  shot him.

20     **PRESIDING COMMISSIONER GARNER:**  Okay.  So

21  there was one time while you were struggling

22  with him on the ground that he gets shot?

23     **INMATE EVINS:**  Yes.

24     **PRESIDING COMMISSIONER GARNER:**  You get

25  sole possession of the gun, you stand up?

26     **INMATE EVINS:**  He got shot three times.

27     **PRESIDING COMMISSIONER GARNER:**  Okay.

86

1    Thank you.  You've mentioned a couple times that

2    there seems to be a pattern of bad things

3    following you into communities.  You said you

4    went to Fresno to kind of get away from the

5    madness of Oakland, your words.

6         INMATE EVINS:  Yes.

7         PRESIDING COMMISSIONER GARNER:  And the

8    only thing I want to ask you is do you know

9    anything about San Jose?

10        INMATE EVINS:  Do I know anything about San

11   Jose?  I just know that it's a very progressive

12   city.  One of the fastest growing cities in

13   northern California.

14        PRESIDING COMMISSIONER GARNER:  Okay.

15   Well, kind of something to think about.  A lot

16   of the same elements --

17        INMATE EVINS:  Yeah, I read the paper.

18   Yes, I know.

19        PRESIDING COMMISSIONER GARNER:  That you

20   found in Oakland?  That you found in Fresno?

21        INMATE EVINS:  I knew these people in

22   Oakland.  I knew these people in Fresno, and I

23   was into that lifestyle.

24        PRESIDING COMMISSIONER GARNER:  Okay.

25        INMATE EVINS:  Or into that lifestyle.

26        PRESIDING COMMISSIONER GARNER:  Okay.

27   That's fine.  As long as you've had some thought

87

1  process about it.

2      INMATE EVINS:  It's pretty the same way all

3  across California.  Pretty much that way across

4  the United States because I grew up in Kansas

5  City, Missouri, and it was probably worse than

6  both those places.

7      PRESIDING COMMISSIONER GARNER:  Okay.

8  Thank you.  Mr. Haas, any questions?

9      DEPUTY DISTRICT ATTORNEY HAAS:  I have a

10  few.  I guess what I'm trying to figure out is

11  did Mr. -- was it Evins?

12      PRESIDING COMMISSIONER GARNER:  Evins.

13      DEPUTY DISTRICT ATTORNEY HAAS:  Evins.  Did

14  he plan on shooting the other person when he

15  went to the house where Marcy was at in the

16  bedroom with the gun?

17      INMATE EVINS:  Possibly because we had had

18  -- this other person had pulled a gun on me at

19  that same house, probably within the last 48

20  hours of that and robbed me.

21      PRESIDING COMMISSIONER GARNER:  Okay.

22  Thank you.

23      DEPUTY DISTRICT ATTORNEY HAAS:  So I guess

24  --

25      INMATE EVINS:  Possibly, I don't know,

26  possibly.

27      DEPUTY DISTRICT ATTORNEY HAAS:  So I guess

88

1  my question is, and maybe it's here, I'm just

2  not seeing it, but then why did he go to that

3  house if he knew this was a guy there that he

4  had already had a problem with?

5      INMATE EVINS:  That's a good question.

6  Because that person was there, and I expected to

7  see him.  I was either going to see him there.

8  I was going to see him in the street.  It just a

9  matter of time.  I was going to run into him

10  somewhere in, you know, it's better at that time

11  that I had the advantage on him, you know, I

12  didn't know he was -- you know, when I went to

13  the house -- when I got the call, nobody was in

14  the bed.  He called and said that everybody was

15  up.  That was my understanding.  So I didn't go

16  there to catch anybody sleeping, you know.  This

17  guy had robbed me, and I was determined to

18  either get my money back or something.  I wanted

19  to do --

20      DEPUTY DISTRICT ATTORNEY HAAS:  Okay.  And

21  I'm kind, of course those couple, what two,

22  three years ago that you had actually the parole

23  Board decided to give you a parole, or at least

24  set a date, and then the Governor squashed that

25  deal.  How did you feel about that?

26      INMATE EVINS:  I felt bad.  I felt really

27  bad because I have -- I've gone to the Boards so

1  many times, and it's hard.  It's really hard

2  going through what I'm going through today and

3  you know, and rarely do I go up in there and go

4  through, you know, explaining the details when I

5  got the denial.  This is one right there that I

6  was found suitable, but I got denial here,

7  denial here, denial here, and couple more

8  denials, and to do everything -- to do

9  everything that I've been told to do over the

10  years and try to maintain, try to, you know,

11  better myself in prison, myself -- most of the

12  programs I've taken, all of the self-help I did,

13  I didn't take these because anybody directed me

14  to those programs.  I've always tried to -- like

15  I said, when I got out of the service, I went

16  and got into college trying to understand me,

17  what was the matter of me.  I took all these

18  psychology courses trying to figure out me, and

19  in prison I did the same thing.  I try to figure

20  what is the problem, you know, what is the

21  problem.  And I go and get into these trying to

22  better myself, and so after doing everything

23  that the Board done told me to do and more, you

24  know, and then finally get to the point where I

25  was found suitable.  And Ms. Lawland and

26  Vernato, and I can trust these people that they

27  went through it as thorough as you're going

90

1   through it right now.   They went through
2   everything just as thorough and the only
3   discrepancy was that they say was that my story
4   changed slightly, but I admitted to the crime.
5   I'm the person.   I am that guy, and you can take
6   one statement and twist it to the point where
7   this guy is lying, but you know, I read through
8   all the changes that a guy in prison, a lifer,
9   had to go through and these people try -- and I
10  trust their judgment, you know, because
11  (indiscernible) every time, and then get denied,
12  and that you're going to feel bad, but I done
13  got past that.   And I finally made it, and every
14  time they'll tell you you're almost there.
15  You're almost there.   You're almost there, and
16  then to go in there and found suitable, and you
17  feel like why wouldn't I make it.   And then I go
18  through -- my case goes to Sacramento to a
19  parole Panel and it went through even what they
20  call it -- right, it went through two more
21  hearing in Sacramento, and I got through those
22  hearings.   Then I felt a little better that my
23  chance -- may be my chances were good.   Then it
24  goes to the Governor and I know Schwarzenegger
25  don't have the time to sit there and read this
26  little prisoners, this little thing -- I can see
27  him reading Tookie Stanley William's case

 1   because this is a guy, you know, that he had to
 2   read, but I know that he didn't read my case.
 3   So I'm thinking that this is just another, maybe
 4   box with the Board, another -- where they see a
 5   problem and they want to address that problem.
 6   It's another extension of the Board because they
 7   found on the 28th day of the Governor's thing,
 8   and then I get a thing that he reversed the
 9   decision. When I have friends that are going
10   through this three times. I have friends that
11   have gone through this five times, they've been
12   found suitable five times, and I wonder what is
13   it do I have to do. Am I supposed to die here?
14   I just heard on the radio this morning, on MPR,
15   that 44 prisoners died in California prisons
16   through suicide over 2005, and I know over this
17   last year alone -- I know at least six or seven
18   people that I know personally that died right
19   here in the hospital for different reasons, and
20   so is this my demise. Is this what I have to go
21   through, or what do I have to do? I mean, I've
22   did everything, you know, I can't -- I feel bad.
23   Like I said, I'm going to go and talk the
24   Rogers'. I'm going to meet them. This is not a
25   time. I'm going to talk to them because they're
26   -- just like his family -- that woman that I saw
27   in that courtroom reminded me of my grandmother,

1  the same one that raised me, and I know --

2      **DEPUTY COMMISSIONER RICHARDSON:** Hold that

3  thought.

4      **INMATE EVINS:** I never had this happen

5  before, two tapes.

6      **DEPUTY COMMISSIONER RICHARDSON:** Okay. Go

7  head.

8      **INMATE EVINS:** Okay. As I was saying, I

9  feel bad that I don't know if I felt any more

10  bad if this was a guy that I went there but that

11  was the state of mind I was in. I was, you

12  know, I was out there and this was the way, you

13  know, the code of the street more or less. I

14  didn't think about it being a code. These are

15  just the way things happen, and not just Fresno.

16  It happened in like Berkeley, Oakland, and since

17  I've been here -- the DA made it seem -- Mr.

18  Robertson, that was the DA that prosecuted the

19  case, he made it seem like when I was removed

20  from the street all the crime was going to stop.

21  And I was kind of hoping that it was would when

22  it happened, and when I saw that woman sitting

23  in that courtroom, that's when the realization

24  when I seen that old black woman sitting in the

25  courtroom and I looked at that woman, and I felt

26  what she felt. I felt her. This was one of her

27  family members, and that affected me more than -

1   - because now this guy Rogers, like I said, this

2   was a dope house, and this was the wrong person.

3   I never understood, and I thought about it over

4   the years, why was this guy in this dope house,

5   why was he there? Why was he in that place in

6   the first place? This wasn't a social club.

7   This was a serious dope house. This was where a

8   lot of money was being -- a lot of people set

9   there and got high. This was crack cocaine

10  house, and there was people always there 24

11  hours a day. People was running in and out of

12  this place 24 hours -- why was this guy there,

13  you know, so it wasn't -- he was the wrong --

14  this was the wrong person at the wrong time, and

15  I feel bad about that. I did my time. I was

16  sentenced to a certain amount of time. I wasn't

17  sentenced to life without the possibility of

18  parole, and when I -- the laws keep changing

19  since I've been -- it seems like every year a

20  new law comes out, and it affects the guys who

21  are still here. You know, every time the three

22  strikes would come into affect every time

23  somebody -- some gang -- some person that's

24  doing a drive-by in a every city. We get

25  affected by all of this, and I would like to

26  feel that I -- I don't know what else I can do.

27  You know, I've did it all. I've did everything

1   that you can possibly tell me that you would

2   want to do.  I did everything I could think of

3   to do, and I've gone beyond and above the call

4   of duty to do this.

5       **PRESIDING COMMISSIONER GARNER:**  Let me ask

6   the District Attorney if that answers his

7   District Attorney.

8       **DEPUTY DISTRICT ATTORNEY HAAS:**  Yes, it

9   does.

10      **PRESIDING COMMISSIONER GARNER:**  Okay.

11  Thank you, Mr. Evins.

12      **DEPUTY DISTRICT ATTORNEY HAAS:**  One final

13  question regarding the prior conviction for the

14  manslaughter.  What kind of gun was involved in

15  that situation?

16      **INMATE EVINS:**  I think was a 32.

17      **DEPUTY DISTRICT ATTORNEY HAAS:**  Revolver or

18  a semi?

19      **INMATE EVINS:**  This was a -- this was a

20  revolver too.

21      **DEPUTY DISTRICT ATTORNEY HAAS:**  I mean for

22  the manslaughter.

23      **INMATE EVINS:**  This was a revolver.

24      **DEPUTY DISTRICT ATTORNEY HAAS:**  Okay.  I

25  have no more questions.

26      **PRESIDING COMMISSIONER GARNER:**  Thank you,

27  Ms. Christensen.

95

1    **ATTORNEY CHRISTENSEN:** So you realize Mr.

2    Evins as a condition of parole one of the things

3    you would be prohibited from doing would be to

4    possess a gun.

5    **INMATE EVINS:** Yes, ma'am.

6    **ATTORNEY CHRISTENSEN:** Would that any

7    problem for you?

8    **INMATE EVINS:** No, not at all.

9    **ATTORNEY CHRISTENSEN:** How do you feel

10   about guns today?

11   **INMATE EVINS:** I feel that I don't need to

12   be around them, and I don't plan on being around

13   them. And I live -- I've always known about

14   guns. You know, I grew up hunting, rabbit

15   hunting, deer hunting, and all that stuff, you

16   know, I grew up doing this stuff too, also, and

17   I've always known about guns. Then I went to

18   the military and that kind of took it to another

19   level, so guns have always kind of been part of

20   my life, expect right here. I mean, I'm

21   surrounded by guns here even, but I don't have

22   any hands on them, but I have no intentions -- I

23   have found a different way to solve problems.

24   **ATTORNEY CHRISTENSEN:** Okay.

25   **INMATE EVINS:** And it doesn't get more

26   stressful then here as far as being around

27   people.

1    **ATTORNEY CHRISTENSEN:**  One of the things

2    that the Governor raised, and I'll quote, I am

3    gravely concerned he will again resort to

4    violence if he has -- if he is angered or

5    threatened, so I want you to address that.  How

6    do you deal with situations in which you feel

7    angry or threatened, if not a gun, what would

8    you do?

9    **INMATE EVINS:**  Well, I have haven't had a

10    fight in so long.  I have had confrontations,

11    and they didn't result in fist to cuff or

12    violence.  I talk my way through my problems.  I

13    talk my way through this.  We can sit down and

14    we can talk about this.  I don't have to result

15    to violence, and I figure if I can do that here,

16    we got the cream of the crop, the worst of the

17    worst right here at Soledad, you know, right

18    here in -- I'm dealing with some of the most

19    violent people you're probably -- that you're

20    going to run into just where we end up at, we

21    end up at right here, and the possibility of

22    something happening is every day, every day, in

23    the building, in the yard, and it's happening

24    like that all the time.  I'm not involved in

25    that.  My counselor just told me like two or

26    three days ago because I filed paper, I had a

27    writ filed in a court and I keeping getting

1   these denials, not denials, but rejections

2   because they don't get a filing fee.  And she

3   says Evins, she says how do you deal with that.

4   She says, man, I would be pissed off.  She says

5   how do you deal with that, and I said, you know

6   what, it do bother me, but I say I can't afford

7   to go off like that.  And the same thing on the

8   street, I can't afford to come back -- I know --

9   I see all these -- we got a whole two wings of

10  people, over 600 and some people here with three

11  strikes, that are facing three strikes, people

12  my age, younger, much younger and my age.  I

13  don't want to be -- this is not my life.  It

14  have been up until this point, but I don't to

15  deal with that.  I have a job to do.  I have a

16  serious job to, do and that is going out here

17  and trying to teach my kids not to go through

18  what I went through.

19        **ATTORNEY CHRISTENSEN:**  Thank you, Mr.

20  Evins.  I don't have any further questions.

21        **PRESIDING COMMISSIONER GARNER:**  Mr. Haas,

22  would you like to close?

23        **DEPUTY DISTRICT ATTORNEY HAAS:**  Sure.

24  Well, it sounds like Mr. Evins is, you know, try

25  to program very diligently, but I guess I'm

26  disturbed about a couple things here, and I note

27  that the Governor addressed earlier, but first

98

 1   of all, it sounds like to me and at least he was

 2   trying to be honest today, but maybe still a

 3   little bit in denial that when you went to the

 4   house with the firearm where Marcy was at he

 5   intended to use self-help to maybe get back some

 6   money or something that was taken earlier, but

 7   he was going to use a firearm to do it.  And

 8   again that's a problem since he'd already used a

 9   firearm and theoretically, accidentally, in the

10   manslaughter.  And the other thing I wanted to

11   point out was that the, and correct me if I'm

12   wrong, but if I understand that both times that

13   Mr. Evins shot somebody it was with a revolver,

14   and he was in the service.  I think that it's

15   pretty common knowledge that with a revolver you

16   have to intentionally have to pull that trigger

17   to make it discharge, of course, unless the

18   hammer is cocked back.  And if it's either a

19   double or a single action, with a hammer cracked

20   back certainly, it takes less pressure on the

21   trigger to discharge that fire, but if in the

22   case say of the manslaughter I'm just wondering,

23   I'm a little doubtful about Mr. Evins's

24   description of how that happened in terms -- he

25   says they were wallowing around.  They were --

26   the other guy was going for the gun,

27   potentially, so Mr. Evins was trying to get the

1    gun from him and then he accidentally shot him.

2    I just don't see that it was an accident, not

3    with a revolver.  I was thinking a

4    semiautomatic, yeah, maybe, because if there's a

5    round in the chamber and it's, you know,

6    basically activated, ready to be fired, but a

7    revolver is an intentional act to pull that

8    trigger, and especially if the hammer is not

9    pulled back.  So I've got doubts to Mr. Evins's

10   sincerity about him still confronting what he's

11   done in terms of his criminal behavior, two

12   different times people were shot and killed, so

13   I just think that's a big problem.  So based on

14   that the people -- the District Attorney of the

15   county of Fresno would oppose Mr. Evins being

16   found suitable for parole at this time.

17        **PRESIDING COMMISSIONER GARNER:**  Thank you.

18   Ms. Christensen?

19        **ATTORNEY CHRISTENSEN:**  There is absolutely

20   no doubt of Mr. Evins's sincerity today.  You

21   last time found him suitable for parole and I

22   hope once again that is the case for him again.

23   Mr. Evins is an outstanding inmate who has

24   rehabilitated himself.  Clearly, he's a

25   different person today then the man he was then.

26   He is a changed man, and all that is due to the

27   his inner strength, due to the fact that he's

100

1    availed himself to every opportunity here within

2    the prison to improve himself to learn and to

3    grow.  Mr. Evins has impressed me with his

4    intelligence, ambition, sincerity.  He is very

5    pro-social.  He is not at all criminal in his

6    thinking.  He wants to be part of the solution,

7    not part of the problem.  Yes, he did make

8    regrettable choices.  His lifestyle was abysmal

9    at that time, but once coming to prison he

10   turned that all around.  He was highly motivated

11   to change himself and he set upon a course of

12   doing that.  He did that over a very long

13   sustained period of time.  I think he's taken

14   about every self-help group that is available,

15   and if there wasn't one, he would actually start

16   one.  He has helped others.  His parole plans

17   are great.  He can live with his cousin in San

18   Jose, and he's not unrealistic that San Jose is

19   totally without crime, that it's going to be

20   some type of paradise, no, he understands the

21   reality of it.  And he does have family support

22   there.  He can work in the hot dog business,

23   which is apparently is thriving, plus he will

24   have benefits from the VA, so he is going to

25   have an immediate source of income.  He is not

26   going to be a drag on society.  He is going to

27   continue his programming out on the street.  The

1  12 step program will continue to be a integral

2  part of his life.  He knows and works the steps.

3  Mr. Evins is not a cold and callous person.  He

4  is genuinely remorseful.  He feels terrible

5  beyond terrible as to the horror that he has

6  caused and he hopes that his actions of the many

7  years he has been in prison will somehow balance

8  out the bad that he cannot change, and he's only

9  asking for a second chance today.  Thank you.

10      **PRESIDING COMMISSIONER GARNER:**  Thank you.

11  Mr. Evins, it's your opportunity, and if you

12  also want to make the presentation that you came

13  prepared to do.

14      **ATTORNEY CHRISTENSEN:**  I would like him to

15  talk about this and what this means.

16      **INMATE EVINS:**  This was one of many that I

17  have.  I want to address first something that

18  the DA said, and I note from the question that

19  he asked me when he was asking me questions,

20  that he would want to mention that about the

21  revolver and because there was another

22  Commissioner that told him once before that it

23  with was a revolver.  He said the exact same

24  thing that the DA said, about -- take a act to

25  actively pull that hammer back.  I could of

26  changed that, but it was still a revolver, and

27  this -- it wasn't an accident.  I didn't say

1  that it was an accident.  Me and this guy, this

2  guy was going to kill me.  He said he was going

3  to kill me, and I knew -- I knew he would.  He

4  said he was going to kill me, so that personally

5  wasn't an accident.  The second guy, like I

6  said, I didn't know Mr. Rogers.  And it was the

7  wrong person, and I did go there with intention

8  to get this guy Lenny Newhouse and I appreciate

9  if you would really, the DA would write this

10  name down, Lenny Newhouse, and when he gets back

11  to Fresno pull that name up and see this guy's

12  history.  Now, this guy has a history -- okay.

13      **ATTORNEY CHRISTENSEN:**  Mr. Evins, why don't

14  we just --

15      **PRESIDING COMMISSIONER GARNER:**  This is

16  good quality --

17      **ATTORNEY CHRISTENSEN:**  -- reserve to why

18  you feel are suitable for parole.

19      **INMATE EVINS:**  It has -- this is the third

20  one I did in this series and I call it

21  (indiscernible) because these are the things

22  that bring us to prison.  I got all the drugs.

23  I got people trapped inside of this cocaine

24  pipe.  I got people -- the things that alter our

25  minds, mind control, TV.  I do a lot of pictures

26  here, and the education sometime ask me to put

27  up display.  I fill up their whole display cases

103

1    with pictures.  Their brothers see the

2    tombstones back here, and I got this California

3    prison system.  And you see the red flag and the

4    blue flag, they are connected, so this is like

5    for the gang bangers more or less to see this

6    type of stuff.

7        **ATTORNEY CHRISTENSEN:**  What about the gun

8    part?

9        **INMATE EVINS:**  Yes, this -- these are

10   things that bring us to prison, but this is what

11   this picture right here depicts.  It depicts

12   that type of thing that brings us to prison.

13   Now, I bought this art work maybe because I get

14   Commissioners in the past who say well, we never

15   see any of this art work, so I do stuff like

16   that on canvas, and I do -- I guess -- I sent

17   out over a hundred pictures, probably -- way

18   over a hundred pictures to (indiscernible) and

19   mostly afro-centric art.  And I've entered stuff

20   in contests here, and I've won a few.  And I'm

21   getting -- I think I'm pretty good because I've

22   got people now trying to get at me constantly --

23   and this is the type of drawing I do.  This type

24   of work right here, so it's not just a fluke.

25   It's not me saying I'm going to go out of here

26   and try to do some art because I know about the

27   starving artists and people out there

104

1   struggling, but now they have ebay, you know,

2   they have all these different means. They all

3   these galleries, you know, that I can get into.

4   I've written art -- I've written galleries, and

5   I don't get a lot of responses back. Here in

6   prison you don't get a lot of responses back

7   from a lot of people, so, but this is just some,

8   you know, and this was taking like a pencil, or

9   I take one pencil and I try to create all of

10  these different colors out of one pencil, so I

11  practice. This is my therapy. This is what I

12  do every day. I write. I write short stories.

13  I've written -- and I do this art every day.

14  This is my type of therapy. This is what I'll

15  do when I'm on the street, when I'm out there.

16  And like I said, I don't plan on using drugs

17  anymore in any life. This is my type -- this is

18  my therapy right here. This is what I do. I

19  will go get those grandkids and I will take

20  those grandkids, you know, to the park and work

21  out with them, but anything other than what I

22  did in the past. I don't plan on repeating

23  anything from my past. I had enough of that,

24  and this is a result -- and I know as a result

25  of what I did and this is it, 21 years out of my

26  life is enough, that's enough. And my sons, I'm

27  really concerned about them because they are the

1    ones -- I tell my sons, you know, said, you

2    know, we got 33 prisons in California, but 160

3    thousand people in them, and they didn't build

4    them for me.  They built them for you, you know,

5    these prisons.  They didn't build these prisons

6    for me.  They built them for you, so I got --

7    still they think that they can do things

8    different from the way we did them.  This is the

9    last one I'm taking out, but there was a guy

10   named Homer Winslow, and I saw this picture

11   right here when I was a little kid in Kansas

12   City.

13        **DEPUTY COMMISSIONER RICHARDSON:** Yeah,

14   yeah.

15        **INMATE EVINS:** I saw this picture in a big

16   museum, and it just stuck in my head, so one day

17   I was going through a National Geographic and I

18   said wow, there's a picture again, so I wanted

19   to see if I could do it, and I just did it, but

20   I do a lot of pictures from this type of stuff.

21   So but anyway that's -- I just wanted to bring

22   that in here and show because like I said, I've

23   had Commissioners who said well, we never see

24   any of this, so this particular time I wanted to

25   bring it in and show it and if the case is full

26   of all the other type -- I do political

27   pictures.  I do a lot of stuff now dealing with

1  the prison system, but it's always showing

2  people this is not where it's supposed to be.

3  This is not how it's supposed to be, but really

4  it's a message to most of the youngsters around

5  here.  Mostly anybody that will look at it.

6  There's a serious mention on here about this is

7  not where we supposed to be.  This is not what

8  we're supposed to be doing, and this is the

9  result of it, so I'm not going to take anymore

10  of those.  There is a lot more in here, and --

11  but anyway, if I was doing a presentation on the

12  street or something, which I plan on doing, and

13  I would probably do it more in depth, but I just

14  wanted you to get a idea of what it is I plan on

15  doing and how -- the type that of stuff that I

16  do here.  And the stories that I write, I'm

17  sending stories out to different places and I'm

18  getting a lot of good comments back from those.

19  I write about everything.  I write about my

20  life.  I've written a short story, you know, a

21  book that I can kind of superficially mention,

22  everything that I've ever did and that I can get

23  into and expound on later.  So I have worked on

24  me, and I worked on me in depth worked on me.

25  Now everything that you don't -- probably,

26  everything I say you can find fault in,

27  everything I say, and that's normal.  That's

1    human.   But I've changed, I'm not the same

2    person that I was when I came in here in '86.

3    I'm not even close to that same person anymore,

4    and I plan on going out there and doing the

5    right thing.

6        **PRESIDING COMMISSIONER GARNER:**   Okay.

7    Thank you.   The time is now 2:35 p.m. and we'll

8    recess for deliberations.

9                    **R E C E S S**

10                    --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

108

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3        DEPUTY COMMISSIONER RICHARDSON:  We are on

4    record.

5        PRESIDING COMMISSIONER GARNER:  Okay.  The

6    time is now 2:57 p.m. in the matter of Glynnon,

7    G-L-Y-N-N-O-N, Evins, CDC number D-24948.  Mr.

8    Evins, the Panel has reviewed all the

9    information received from the public and relied

10   on the following circumstances in concluding

11   that you're suitable for parole and would not

12   pose an unreasonable risk of danger to society

13   or a threat to public safety if you're released

14   from prison.

15       INMATE EVINS:  Thank you.

16       PRESIDING COMMISSIONER GARNER:  You okay

17   now?

18       INMATE EVINS:  Yes, sir, thank you.

19       PRESIDING COMMISSIONER GARNER:  Okay.  Sir,

20   we reached this decision after a considerable

21   discussion.  A lot of information was reviewed,

22   and this was an apparently lengthy hearing so

23   there's a fair amount of stuff on the record,

24   and that was done with your interest at heart,

25   so we wanted to make sure we covered everything

26   that was important.  With that in mind, we

27   GLYNNON EVINS D-24948 DECISION PAGE 1 1/4/06

1. determined that you have no juvenile record of
2. assaulting others, and while you've been in
3. prison you've enhanced your ability to function
4. within the law upon release through
5. participation and education programs, self-help,
6. vocational, and in your assignments here in the
7. prison.  I think it was mentioned earlier by you
8. or your counsel, you basically came in here and
9. took advantage of every opportunity to make
10. yourself a better person, and you've done that.
11. Sir, it was the opinion of the Panel that this
12. crime was committed as a result of some
13. significant stress in your life at the time.
14. You returned from Vietnam and unfortunately you
15. found yourself in a life that was consumed by
16. the use of drugs, and the sorts of people that
17. run in that particular life.  Sir, we also
18. concluded that because of maturation, growth,
19. and greater understanding and/or in your case,
20. you're an older person now.  The likelihood of
21. recidivism is greatly reduced.  You've got
22. realistic parole plans that include a job offer
23. and family support.  There is a business in San
24. Jose.  You also as identified today would have
25. expanded and enhanced benefits through the
26. Veteran's Administration that would provide you
27. **GLYNNON EVINS D-24948 DECISION PAGE 2 1/4/06**

110

1  some supplemental information.  You also have

2  some potential, although I wouldn't hang your

3  hat on the art, I think art is yours right now

4  and if you manage to sell some pieces, that's

5  just great, but right now I think your plans are

6  realistic in the other area.  You maintained

7  close family ties while in prison via letters

8  and visits, and the Panel feels that you've got

9  strong family support.  You've got some good

10  people waiting for you outside.  You showed

11  signs of remorse.  You indicated that you

12  understand the nature and magnitude of the

13  offense, accept the responsibility for the

14  criminal behavior, and also, in that I think you

15  had a real moment of truth when you identified

16  with the elderly lady sitting in the back of the

17  courtroom and personalized that to your own

18  situation.  And sir, we also had a lengthy

19  hearing today, but by your own admission,

20  resulted in you examining some aspects that

21  hadn't been mentioned in previous board reports,

22  and I think that was to your advantage also.

23  The psychiatric report was dated August of 2005

24  by Dr. Howlin, H-O-W-L-I-N, is favorable.  In

25  fact, the doctor stated very clearly that there

26  is no need to continue returning you back for

27  **GLYNNON EVINS D-24948 DECISION PAGE 3 1/4/06**

1    psychological evaluations.  The doctor also

2    noted that had you've got excellent insight into

3    your past.  Sir, we did some of the

4    calculations, and just for the record, the

5    baseline of the offense that you were convicted,

6    187 of the Penal Code, murder second degree, the

7    offense occurred on January 15th, 1985, and we

8    use section 2403(b) for a first degree -- excuse

9    me.  I used the wrong section 2403(c), second-

10   degree murder, offense committed before November

11   8, 1978.  The Panel finds that category 3c is

12   appropriate, in that Otis Rogers died of severe

13   trauma and the Panel concluded from report, and

14   also from your statement, that you apparently

15   had no prior relationship and didn't know Mr.

16   Rogers.  We assessed 240 months.  We chose the

17   middle term as opposed to aggravating or

18   mitigating.  The Panel also assessed a period of

19   30 months for a previous crime giving you a

20   total of 270 months.  We adjusted the post-

21   conviction credits from October 27, 1986, to

22   today's date of January 4, 2006, for a credit of

23   76 months, leaving a grand total of a 194

24   months, which you've taken care of.  Some

25   special conditions, sir, that we've established.

26   One is that you don't use alcoholic beverages,

27   **GLYNNON EVINS D-24948 DECISION PAGE 4 1/4/06**

112

1    submit to alcohol testing, submit to anti-

2    narcotic testing, submit to THC testing,

3    participate in a substance abuse program, AA or

4    NA, on the outside, and attend the alcohol --

5    excuse me, parole outpatient clinic.  Also,

6    we're going to make a note that you be paroled

7    to Santa Clara County, and as I said, the other

8    assessment was for the manslaughter charge, case

9    number 59402, count number two.  Commissioner,

10   did you have any additional comments?

11       **DEPUTY COMMISSIONER RICHARDSON:**  Good luck

12   to you, sir.

13       **INMATE EVINS:**  Thank you both.

14       **DEPUTY COMMISSIONER RICHARDSON:**  I think

15   you should definitely pursue the idea of

16   becoming a counselor.  I hope you can do that

17   through the VA and the community college.

18       **INMATE EVINS:**  Thank you.

19       **DEPUTY COMMISSIONER RICHARDSON:**  I think

20   that would help a lot.

21       **INMATE EVINS:**  Thank you very, very much.

22       **PRESIDING COMMISSIONER GARNER:**  Okay.  The

23   time is now 3:03 p.m., and that concludes this

24   hearing.  Good luck to you Mr. Evins, and don't

25   let yourself down.

26       **INMATE EVINS:**  Thank you.

27   **GLYNNON EVINS D-24948 DECISION PAGE 5 1/4/06**

113

1    **ATTORNEY CHRISTENSEN:**   Thank you.

2    **INMATE EVINS:**   Thank you both.

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE GRANTED

## PENDING REVIEW AND APPROVAL

24    THIS DECISION WILL BE FINAL ON:_____

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    GLYNNON EVINS D-24948 DECISION PAGE 6 1/4/06

114

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 113, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF GLYNNON

EVINS, CDC NO. D-24948, ON JANUARY 4, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated January 20, 2006, at Sacramento,

California.

STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT  "C"

48

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    **DEPUTY COMMISSIONER MEJIA:** We're back on

4    record.

5    **PRESIDING COMMISSIONER LAWIN:** Thank you,

6    and all parties have returned to the room in the

7    hearing for Glynnon Evins. The Panel reviewed all

8    information received from the public and relied on

9    the following circumstances in concluding that the

10   prisoner is suitable for parole and would not pose

11   an unreasonable risk of danger to society or a

12   threat to public safety if released from prison.

13   The prisoner has no juvenile record of assaulting

14   others. He has enhanced his ability to function

15   within the law upon release. While in prison,

16   through participation and educational programs, he

17   has completed college courses and continues to be

18   enrolled and work on college courses. He has

19   enhanced his ability through self-help groups such

20   as AA/NA, which he's been involved in since 1995,

21   various volunteer programs such as the Children's

22   Festival, Arts in Corrections, Muslim activities

23   and religious services. He has completed

24   Religious Ethics class, Life Skills, Victims

25   Awareness Group, Impact workshop, Infectious

26   Disease courses, participated in other

27   **GLYNNON EVINS    D-24948    DECISION PAGE 1    9/15/03**

49

1   fundraisers, worked in and completed Process

2   Group, Reality in Decision Making, Rational

3   Behavior, has been in MAC, involved in MAC for a

4   number of years. Was involved in Vietnam Veterans

5   Group and completed Anger Management, as well as

6   has been a teacher in public health education

7   groups. He has also enhanced his ability to

8   function through vocational programs having

9   completed vocational data processing. He spent

10  some time in dental lab and the electrical program

11  as an electrician. He also has enhanced his

12  ability through institutional job assignments,

13  such as hobby clerk, Arts in Corrections as an

14  artist, a clerk, and an artist's assistant,

15  through his work as a sewing machine operator and

16  tailor. He lacks, because of maturation, growth,

17  and a greater understanding, he has a reduced

18  probability of recidivism. He does have realistic

19  parole plans, they do include a job offer, and

20  family support and he has maintained close family

21  ties while in prison. He has maintained positive

22  institutional behavior, which indicates

23  significant improvement in self-control having

24  never received a 115 since he came into the

25  institution. And he shows signs of remorse. He

26  indicates he understands the nature and magnitude

27  **GLYNNON EVINS    D-24948    DECISION PAGE 2    9/15/03**